# HODEL, SECRETARY OF THE INTERIOR *v.* IRVING ET AL.

No. 85–637. Argued October 6, 1986—Decided May 18, 1987

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, MARSHALL, BLACKMUN, POWELL, and SCALIA, JJ., joined. BRENNAN, J., filed a concurring opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 718. SCALIA, J., filed a concurring opinion, in which REHNQUIST, C. J., and POWELL, J., joined, *post*, p. 719.

STEVENS, J., filed an opinion concurring in the judgment, in which WHITE, J., joined, *post*, p. 719.

*Edwin S. Kneedler* argued the cause for appellant. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Habicht, Deputy Solicitor General Wallace, Anne S. Almy,* and *Blake A. Watson.*

*Yvette Hall War Bonnet* argued the cause for appellees. With her on the brief was *Nora K. Kelley.*\*

JUSTICE O'CONNOR delivered the opinion of the Court.

The question presented is whether the original version of the "escheat" provision of the Indian Land Consolidation Act of 1983, Pub. L. 97–459, Tit. II, 96 Stat. 2519, effected a "taking" of appellees' decedents' property without just compensation.

## I

Towards the end of the 19th century, Congress enacted a series of land Acts which divided the communal reservations of Indian tribes into individual allotments for Indians and unallotted lands for non-Indian settlement. This legislation seems to have been in part animated by a desire to force Indians to abandon their nomadic ways in order to "speed the Indians' assimilation into American society," *Solem* v. *Bartlett*, 465 U. S. 463, 466 (1984), and in part a result of pressure to free new lands for further white settlement. *Ibid.* Two years after the enactment of the General Allotment Act of 1887, ch. 119, 24 Stat. 388, Congress adopted a specific statute authorizing the division of the Great Reservation of the Sioux Nation into separate reservations and the allotment of specific tracts of reservation land to individual Indians, con-

---

\**Bertram E. Hirsch* filed a brief for the Sisseton-Wahpeton Sioux Tribe as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for Pacific Legal Foundation by *Ronald A. Zumbrun* and *Robert K. Best;* and for the Yakima Indian Nation by *James B. Hovis.*

ditioned on the consent of three-fourths of the adult male Sioux. Act of Mar. 2, 1889, ch. 405, 25 Stat. 888. Under the Act, each male Sioux head of household took 320 acres of land and most other individuals 160 acres. 25 Stat. 890. In order to protect the allottees from the improvident disposition of their lands to white settlers, the Sioux allotment statute provided that the allotted lands were to be held in trust by the United States. *Id.*, at 891. Until 1910, the lands of deceased allottees passed to their heirs "according to the laws of the State or Territory" where the land was located, *ibid.*, and after 1910, allottees were permitted to dispose of their interests by will in accordance with regulations promulgated by the Secretary of the Interior. 36 Stat. 856, 25 U. S. C. § 373. Those regulations generally served to protect Indian ownership of the allotted lands.

The policy of allotment of Indian lands quickly proved disastrous for the Indians. Cash generated by land sales to whites was quickly dissipated, and the Indians, rather than farming the land themselves, evolved into petty landlords, leasing their allotted lands to white ranchers and farmers and living off the meager rentals. Lawson, Heirship: The Indian Amoeba, reprinted in Hearing on S. 2480 and S. 2663 before the Senate Select Committee on Indian Affairs, 98th Cong., 2d Sess., 82–83 (1984). The failure of the allotment program became even clearer as successive generations came to hold the allotted lands. Thus 40-, 80-, and 160-acre parcels became splintered into multiple undivided interests in land, with some parcels having hundreds, and many parcels having dozens, of owners. Because the land was held in trust and often could not be alienated or partitioned, the fractionation problem grew and grew over time.

A 1928 report commissioned by the Congress found the situation administratively unworkable and economically wasteful. L. Meriam, Institute for Government Research, The

Problem of Indian Administration 40–41. Good, potentially productive, land was allowed to lie fallow, amidst great poverty, because of the difficulties of managing property held in this manner. Hearings on H. R. 11113 before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs, 89th Cong., 2d Sess., 10 (1966) (remarks of Rep. Aspinall). In discussing the Indian Reorganization Act of 1934, Representative Howard said:

> "It is in the case of the inherited allotments, however, that the administrative costs become incredible. . . . On allotted reservations, numerous cases exist where the shares of each individual heir from lease money may be 1 cent a month. Or one heir may own minute fractional shares in 30 or 40 different allotments. The cost of leasing, bookkeeping, and distributing the proceeds in many cases far exceeds the total income. The Indians and the Indian Service personnel are thus trapped in a meaningless system of minute partition in which all thought of the possible use of land to satisfy human needs is lost in a mathematical haze of bookkeeping." 78 Cong. Rec. 11728 (1934).

In 1934, in response to arguments such as these, the Congress acknowledged the failure of its policy and ended further allotment of Indian lands. Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984, 25 U. S. C. § 461 *et seq.*

But the end of future allotment by itself could not prevent the further compounding of the existing problem caused by the passage of time. Ownership continued to fragment as succeeding generations came to hold the property, since, in the order of things, each property owner was apt to have more than one heir. In 1960, both the House and the Senate undertook comprehensive studies of the problem. See House Committee on Interior and Insular Affairs, Indian Heirship Land Study, 86th Cong., 2d Sess. (Comm. Print

1961); Senate Committee on Interior and Insular Affairs, Indian Heirship Land Survey, 86th Cong., 2d Sess. (Comm. Print 1960–1961). These studies indicated that one-half of the approximately 12 million acres of allotted trust lands were held in fractionated ownership, with over 3 million acres held by more than six heirs to a parcel. *Id.*, at pt. 2, p. x. Further hearings were held in 1966, Hearings on H. R. 11113, *supra,* but not until the Indian Land Consolidation Act of 1983 did the Congress take action to ameliorate the problem of fractionated ownership of Indian lands.

Section 207 of the Indian Land Consolidation Act—the escheat provision at issue in this case—provided:

"No undivided fractional interest in any tract of trust or restricted land within a tribe's reservation or otherwise subjected to a tribe's jurisdiction shall descendent *[sic]* by intestacy or devise but shall escheat to that tribe if such interest represents 2 per centum or less of the total acreage in such tract and has earned to its owner less than $100 in the preceding year before it is due to escheat." 96 Stat. 2519.

Congress made no provision for the payment of compensation to the owners of the interests covered by § 207. The statute was signed into law on January 12, 1983, and became effective immediately.

The three appellees—Mary Irving, Patrick Pumpkin Seed, and Eileen Bissonette—are enrolled members of the Oglala Sioux Tribe. They are, or represent, heirs or devisees of members of the Tribe who died in March, April, and June 1983. Eileen Bissonette's decedent, Mary Poor Bear-Little Hoop Cross, purported to will all her property, including property subject to § 207, to her five minor children in whose name Bissonette claims the property. Chester Irving, Charles Leroy Pumpkin Seed, and Edgar Pumpkin Seed all died intestate. At the time of their deaths, the four dece-

dents owned 41 fractional interests subject to the provisions of § 207. App. 20, 22–28, 32–33, 37–39. The Irving estate lost two interests whose value together was approximately $100; the Bureau of Indian Affairs placed total values of approximately $2,700 on the 26 escheatable interests in the Cross estate and $1,816 on the 13 escheatable interests in the Pumpkin Seed estates. But for § 207, this property would have passed, in the ordinary course, to appellees or those they represent.

Appellees filed suit in the United States District Court for the District of South Dakota, claiming that § 207 resulted in a taking of property without just compensation in violation of the Fifth Amendment. The District Court concluded that the statute was constitutional. It held that appellees had no vested interest in the property of the decedents prior to their deaths and that Congress had plenary authority to abolish the power of testamentary disposition of Indian property and to alter the rules of intestate succession. App. to Juris. Statement 21a–26a.

The Court of Appeals for the Eighth Circuit reversed. *Irving* v. *Clark*, 758 F. 2d 1260 (1985). Although it agreed that appellees had no vested rights in the decedents' property, it concluded that their decedents had a right, derived from the original Sioux allotment statute, to control disposition of their property at death. The Court of Appeals held that appellees had standing to invoke that right and that the taking of that right without compensation to decedents' estates violated the Fifth Amendment.[1]

---

[1] The Court of Appeals, without explanation, went on to "declare" that not only the original version of § 207, but also the amended version not before it, 25 U. S. C. § 2206 (1982 ed., Supp. III), unconstitutionally took property without compensation. Since none of the property which escheated in this case did so pursuant to the amended version of the statute, this "declaration" is, at best, dicta. We express no opinion on the constitutionality of § 207 as amended.

## II

The Court of Appeals concluded that appellees have standing to challenge § 207.  758 F. 2d, at 1267–1268.  The Government does not contest this ruling.  As the Court of Appeals recognized, however, the existence of a case or controversy is a jurisdictional prerequisite to a federal court's deliberations.  *Id.*, at 1267, n. 12.  We are satisfied that the necessary case or controversy exists in this case.  Section 207 has deprived appellees of the fractional interests they otherwise would have inherited.  This is sufficient injury-in-fact to satisfy Article III of the Constitution.  See *Singleton* v. *Wulff*, 428 U. S. 106, 112 (1976).

In addition to the constitutional standing requirements, we have recognized prudential standing limitations.  As the court below recognized, one of these prudential principles is that the plaintiff generally must assert his own legal rights and interests.  758 F. 2d, at 1267–1268.  That general principle, however, is subject to exceptions.  Appellees here do not assert that their own property rights have been taken unconstitutionally, but rather that their decedents' right to pass the property at death has been taken.  Nevertheless, we have no difficulty in finding the concerns of the prudential standing doctrine met here.

For obvious reasons, it has long been recognized that the surviving claims of a decedent must be pursued by a third party.  At common law, a decedent's surviving claims were prosecuted by the executor or administrator of the estate.  For Indians with trust property, statutes require the Secretary of the Interior to assume that general role.  25 U. S. C. §§ 371–380.  The Secretary's responsibilities in that capacity, however, include the administration of the statute that the appellees claim is unconstitutional, see 25 U. S. C. §§ 2202, 2209, so that he can hardly be expected to assert appellees' decedents' rights to the extent that they turn on that point.  Under these circumstances, appellees can appropriately serve as their decedents' representatives for purposes of asserting

the latters' Fifth Amendment rights. They are situated to pursue the claims vigorously, since their interest in receiving the property is indissolubly linked to the decedents' right to dispose of it by will or intestacy. A vindication of decedents' rights would ensure that the fractional interests pass to appellees; pressing these rights unsuccessfully would equally guarantee that appellees take nothing. In short, permitting appellees to raise their decedents' claims is merely an extension of the common law's provision for appointment of a decedent's representative. It is therefore a "settled practice of the courts" not open to objection on the ground that it permits a litigant to raise third parties' rights. *Tyler* v. *Judges of Court of Registration,* 179 U. S. 405, 406 (1900).

## III

The Congress, acting pursuant to its broad authority to regulate the descent and devise of Indian trust lands, *Jefferson* v. *Fink,* 247 U. S. 288, 294 (1918), enacted § 207 as a means of ameliorating, over time, the problem of extreme fractionation of certain Indian lands. By forbidding the passing on at death of small, undivided interests in Indian lands, Congress hoped that future generations of Indians would be able to make more productive use of the Indians' ancestral lands. We agree with the Government that encouraging the consolidation of Indian lands is a public purpose of high order. The fractionation problem on Indian reservations is extraordinary and may call for dramatic action to encourage consolidation. The Sisseton-Wahpeton Sioux Tribe, appearing as *amicus curiae* in support of the Secretary of the Interior, is a quintessential victim of fractionation. Forty-acre tracts on the Sisseton-Wahpeton Lake Traverse Reservation, leasing for about $1,000 annually, are commonly subdivided into hundreds of undivided interests, many of which generate only pennies a year in rent. The average tract has 196 owners and the average owner undivided interests in 14 tracts. The administrative headache this rep-

resents can be fathomed by examining Tract 1305, dubbed "one of the most fractionated parcels of land in the world." Lawson, Heirship: The Indian Amoeba, reprinted in Hearing on S. 2480 and S. 2663 before the Senate Select Committee on Indian Affairs, 98th Cong., 2d Sess., 85 (1984). Tract 1305 is 40 acres and produces $1,080 in income annually. It is valued at $8,000. It has 439 owners, one-third of whom receive less than $.05 in annual rent and two-thirds of whom receive less than $1. The largest interest holder receives $82.85 annually. The common denominator used to compute fractional interests in the property is 3,394,923,840,000. The smallest heir receives $.01 every 177 years. If the tract were sold (assuming the 439 owners could agree) for its estimated $8,000 value, he would be entitled to $.000418. The administrative costs of handling this tract are estimated by the Bureau of Indian Affairs at $17,560 annually. *Id.*, at 86, 87. See also Comment, Too Little Land, Too Many Heirs — The Indian Heirship Land Problem, 46 Wash. L. Rev. 709, 711–713 (1971).

This Court has held that the Government has considerable latitude in regulating property rights in ways that may adversely affect the owners. See *Keystone Bituminous Coal Assn.* v. *DeBenedictis,* 480 U. S. 470, 491–492 (1987); *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104, 125–127 (1978); *Goldblatt* v. *Hempstead,* 369 U. S. 590, 592–593 (1962). The framework for examining the question whether a regulation of property amounts to a taking requiring just compensation is firmly established and has been regularly and recently reaffirmed. See, *e. g., Keystone Bituminous Coal Assn.* v. *DeBenedictis, supra,* at 485; *Ruckelshaus* v. *Monsanto Co.,* 467 U. S. 986, 1004–1005 (1984); *Hodel* v. *Virginia Surface Mining and Reclamation Assn., Inc.,* 452 U. S. 264, 295 (1981); *Agins* v. *Tiburon,* 447 U. S. 255, 260–261 (1980); *Kaiser Aetna* v. *United States,* 444 U. S. 164, 174–175 (1979); *Penn Central Transportation Co.*

v. *New York City, supra,* at 124.  As THE CHIEF JUSTICE
has written:

> "[T]his Court has generally 'been unable to develop any
> "set formula" for determining when "justice and fair-
> ness" require that economic injuries caused by public ac-
> tion be compensated by the government, rather than re-
> main disproportionately concentrated on a few persons.'
> [*Penn Central Transportation Co.* v. *New York City,*
> 438 U. S.], at 124.  Rather, it has examined the 'tak-
> ing' question by engaging in essentially ad hoc, factual
> inquiries that have identified several factors—such as
> the economic impact of the regulation, its interference
> with reasonable investment backed expectations, and
> the character of the governmental action—that have
> particular significance. *Ibid.*"  *Kaiser Aetna* v. *United
> States, supra,* at 175.

There is no question that the relative economic impact of
§ 207 upon the owners of these property rights can be sub-
stantial.   Section 207 provides for the escheat of small un-
divided property interests that are unproductive during
the year preceding the owner's death.   Even if we accept
the Government's assertion that the income generated by
such parcels may be properly thought of as *de minimis,* their
value may not be.   While the Irving estate lost two interests
whose value together was only approximately $100, the Bu-
reau of Indian Affairs placed total values of approximately
$2,700 and $1,816 on the escheatable interests in the Cross
and Pumpkin Seed estates.   See App. 20, 21–28, 29–39.
These are not trivial sums.   There are suggestions in the
legislative history regarding the 1984 amendments to § 207
that the failure to "look back" more than one year at the in-
come generated by the property had caused the escheat of
potentially valuable timber and mineral interests.   S. Rep.
No. 98–632, p. 12 (1984); Hearing on H. J. Res. 158 before
the Senate Select Committee on Indian Affairs, 98th Cong.,
2d Sess., 20, 26, 32, 75 (1984); Amendments to the Indian

Land Consolidation Act: Hearing on H. J. Res. 158 before the Senate Select Committee on Indian Affairs, 98th Cong., 1st Sess., 8, 29 (1983). Of course, the whole of appellees' decedents' property interests were not taken by § 207. Appellees' decedents retained full beneficial use of the property during their lifetimes as well as the right to convey it *inter vivos*. There is no question, however, that the right to pass on valuable property to one's heirs is itself a valuable right. Depending on the age of the owner, much or most of the value of the parcel may inhere in this "remainder" interest. See 26 CFR § 20.2031–7(f) (Table A) (1986) (value of remainder interest when life tenant is age 65 is approximately 32% of the whole).

The extent to which any of appellees' decedents had "investment-backed expectations" in passing on the property is dubious. Though it is conceivable that some of these interests were purchased with the expectation that the owners might pass on the remainder to their heirs at death, the property has been held in trust for the Indians for 100 years and is overwhelmingly acquired by gift, descent, or devise. Because of the highly fractionated ownership, the property is generally held for lease rather than improved and used by the owners. None of the appellees here can point to any specific investment-backed expectations beyond the fact that their ancestors agreed to accept allotment only after ceding to the United States large parts of the original Great Sioux Reservation.

Also weighing weakly in favor of the statute is the fact that there is something of an "average reciprocity of advantage," *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 415 (1922), to the extent that owners of escheatable interests maintain a nexus to the Tribe. Consolidation of Indian lands in the Tribe benefits the members of the Tribe. All members do not own escheatable interests, nor do all owners belong to the Tribe. Nevertheless, there is substantial overlap between the two groups. The owners of escheatable inter-

ests often benefit from the escheat of others' fractional interests.  Moreover, the whole benefit gained is greater than the sum of the burdens imposed since consolidated lands are more productive than fractionated lands.

If we were to stop our analysis at this point, we might well find § 207 constitutional.  But the character of the Government regulation here is extraordinary.  In *Kaiser Aetna* v. *United States*, 444 U. S., at 176, we emphasized that the regulation destroyed "one of the most essential sticks in the bundle of rights that are commonly characterized as property—the right to exclude others."  Similarly, the regulation here amounts to virtually the abrogation of the right to pass on a certain type of property—the small undivided interest— to one's heirs.  In one form or another, the right to pass on property—to one's family in particular—has been part of the Anglo-American legal system since feudal times.  See *United States* v. *Perkins*, 163 U. S. 625, 627–628 (1896). The fact that it may be possible for the owners of these interests to effectively control disposition upon death through complex *inter vivos* transactions such as revocable trusts is simply not an adequate substitute for the rights taken, given the nature of the property.  Even the United States concedes that total abrogation of the right to pass property is unprecedented and likely unconstitutional.  Tr. of Oral Arg. 12–14.  Moreover, this statute effectively abolishes both descent and devise of these property interests even when the passing of the property to the heir might result in consolidation of property—as for instance when the heir already owns another undivided interest in the property.[2]  Cf. 25 U. S. C.

---

[2]JUSTICE STEVENS argues that weighing in the balance the fact that § 207 takes the right to pass property even when descent or devise results in consolidation of Indian lands amounts to an unprecedented importation of overbreadth analysis into our Fifth Amendment jurisprudence.  *Post,* at 724–726.  The basis for this argument is his assertion that none of appellees' decedents actually attempted to pass the property in a way that might have resulted in consolidation.  But the fact of the matter remains that before § 207 was enacted appellees' decedents had the power to pass on

§ 2206(b) (1982 ed., Supp. III). Since the escheatable interests are not, as the United States argues, necessarily *de minimis*, nor, as it also argues, does the availability of *inter vivos* transfer obviate the need for descent and devise, a *total* abrogation of these rights cannot be upheld. But cf. *Andrus* v. *Allard*, 444 U. S. 51 (1979) (upholding abrogation of the right to sell endangered eagles' parts as necessary to environmental protection regulatory scheme).

In holding that complete abolition of both the descent and devise of a particular class of property may be a taking, we reaffirm the continuing vitality of the long line of cases recognizing the States', and where appropriate, the United States', broad authority to adjust the rules governing the descent and devise of property without implicating the guarantees of the Just Compensation Clause. See, *e. g., Irving Trust Co.* v. *Day*, 314 U. S. 556, 562 (1942); *Jefferson* v. *Fink*, 247 U. S., at 294. The difference in this case is the fact that both descent and devise are completely abolished;

---

their property at death to those who already owned an interest in the subject property. This right too was abrogated by § 207; each of the appellees' decedents lost this stick in their bundles of property rights upon the enactment of § 207. It is entirely proper to note the extent of the rights taken from appellees' decedents in assessing whether the statute passes constitutional muster under the *Penn Central* balancing test. This is neither overbreadth analysis nor novel. See, *e. g., Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 493–502 (1987) (discussing, in general terms, the extent of the abrogation of coal extraction rights caused by the Subsidence Act); *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 136–137 (1978) (discussing extent to which air rights abrogated by the designation of Grand Central Station as a landmark, noting that not all new construction prohibited, and noting the availability of transferable development rights).

JUSTICE STEVENS' objections are perhaps better directed at the question whether there is third-party standing to challenge this statute under the Fifth Amendment's Just Compensation Clause. But as we have shown, there is certainly no Article III bar to permitting appellees to raise their decedents' claims, *supra*, at 711, and JUSTICE STEVENS himself concedes that prudential considerations do not bar consideration of the Fifth Amendment claim. *Post*, at 724.

indeed they are abolished even in circumstances when the governmental purpose sought to be advanced, consolidation of ownership of Indian lands, does not conflict with the further descent of the property.

There is little doubt that the extreme fractionation of Indian lands is a serious public problem. It may well be appropriate for the United States to ameliorate fractionation by means of regulating the descent and devise of Indian lands. Surely it is permissible for the United States to prevent the owners of such interests from further subdividing them among future heirs on pain of escheat. See *Texaco, Inc.* v. *Short*, 454 U. S. 516, 542 (1982) (BRENNAN, J., dissenting). It may be appropriate to minimize further compounding of the problem by abolishing the descent of such interests by rules of intestacy, thereby forcing the owners to formally designate an heir to prevent escheat to the Tribe. What is certainly not appropriate is to take the extraordinary step of abolishing both descent and devise of these property interests even when the passing of the property to the heir might result in consolidation of property. Accordingly, we find that this regulation, in the words of Justice Holmes, "goes too far." *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S., at 415. The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring.

I find nothing in today's opinion that would limit *Andrus* v. *Allard*, 444 U. S. 51 (1979), to its facts. Indeed, largely for reasons discussed by the Court of Appeals, I am of the view that the unique negotiations giving rise to the property rights and expectations at issue here make this case the unusual one. See *Irving* v. *Clark*, 758 F. 2d 1260, 1266–1269, and n. 10 (CA8 1985). Accordingly, I join the opinion of the Court.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE POWELL join, concurring.

I join the opinion of the Court. I write separately to note that in my view the present statute, insofar as concerns the balance between rights taken and rights left untouched, is indistinguishable from the statute that was at issue in *Andrus v. Allard*, 444 U. S. 51 (1979). Because that comparison is determinative of whether there has been a taking, see *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 136 (1978); *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 413 (1922), in finding a taking today our decision effectively limits *Allard* to its facts.

JUSTICE STEVENS, with whom JUSTICE WHITE joins, concurring in the judgment.

The Government has a legitimate interest in eliminating Indians' fractional holdings of real property. Legislating in pursuit of this interest, the Government might constitutionally have consolidated the fractional land interests affected by § 207 of the Indian Land Consolidation Act of 1983, 96 Stat. 2519, 25 U. S. C. § 2206 (1982 ed., Supp. III), in three ways: It might have purchased them; it might have condemned them for a public purpose and paid just compensation to their owners; or it might have left them untouched while conditioning their descent by intestacy or devise upon their consolidation by voluntary conveyances within a reasonable period of time.

Since Congress plainly did not authorize either purchase or condemnation and the payment of just compensation, the statute is valid only if Congress, in § 207, authorized the third alternative. In my opinion, therefore, the principal question in this case is whether § 207 represents a lawful exercise of the sovereign's prerogative to condition the retention of fee simple or other ownership interests upon the performance of a modest statutory duty within a reasonable period of time.

I

The Court's opinion persuasively demonstrates that the Government has a strong interest in solving the problem of fractionated land holdings among Indians. It also indicates that the specific escheat provision at issue in this case was one of a long series of congressional efforts to address this problem. The Court's examination of the legislative history, however, is incomplete. An examination of the circumstances surrounding Congress' enactment of § 207 discloses the abruptness and lack of explanation with which Congress added the escheat section to the other provisions of the Indian Land Consolidation Act that it enacted in 1983. See *ante,* at 708–709.

In 1982, the Senate passed a special bill for the purpose of authorizing the Devils Lake Sioux Tribe of North Dakota to adopt a land consolidation program with the approval of the Secretary of the Interior.[1] That bill provided that the Tribe would compensate individual owners for any fractional interest that might be acquired; the bill did not contain any provision for escheat.[2]

When the Senate bill was considered by the House Committee on Indian Affairs, the Committee expanded the coverage of the legislation to authorize any Indian tribe to adopt a land consolidation program with the approval of the Secretary, and it also added § 207—the escheat provision at issue in this case—to the bill. H. R. Rep. No. 97–908, pp. 5, 9

---

[1] S. 503, 97th Cong., 2d Sess. (1982).

[2] The Report of the Senate Select Committee on Indian Affairs described the purpose of the bill as follows:

"The purpose of S. 503 is to authorize the purchase, sale, and exchange of lands by the Devils Lake Sioux Tribe of the Devils Lake Sioux Reservation, North Dakota. The bill is designed to allow the Tribe to consolidate land ownership with the reservation in order to maximize utilization of the reservation land base. The bill also would restrict inheritance of trust property to members of the Tribe provided that the Tribe paid fair market value to the Secretary of the Interior on behalf of the decedent's estate." S. Rep. No. 97–507, p. 3 (1982).

(1982).[3] The Report on the House Amendments does not specifically discuss § 207. In its general explanation of how Indian trust or restricted lands pass out of Indian ownership, resulting in a need for statutory authorization to tribes to enact laws to prevent the erosion of Indian land ownership, the Report unqualifiedly stated that, "if an Indian allottee dies intestate, his heirs will inherit his property, whether they are Indian or non-Indian." *Id.*, at 11.

The House returned the amended bill to the Senate, which accepted the House addition without hearings and without any floor discussion of § 207. 128 Cong. Rec. 32466–32468 (1982). Section 207 provided:

> "No undivided fractional interest in any tract of trust or restricted land within a tribe's reservation or otherwise subjected to a tribe's jurisdiction shall [descend[4]] by intestacy or devise but shall escheat to that tribe if such interest represents 2 per centum or less of the

---

[3] The House additions were themselves an amended version of H. R. 5856, the Indian Land Consolidation Act. H. R. Rep. No. 97–908, p. 9 (1982). The House Committee on Interior and Insular Affairs had held hearings on H. R. 5856, but these hearings were not published. H. R. Legislative Calendar, 97th Cong., 2d Sess., 72 (1982).

The purposes of the legislation were summarized by the House Committee on Interior and Insular Affairs as (1) to provide mechanisms for the tribes to consolidate their tribal landholdings; (2) to allow Indian tribes or allottees to buy all of the fractionated interests in the tracts without having to obtain the consent of all the owners; and (3) to keep trust lands in Indian ownership by allowing tribes to restrict inheritance of Indian lands to Indians. H. R. Rep. No. 97–908, *supra*, at 9–11.

[4] The word "descedent"—an obvious error—appears in the original text. The Act of Oct. 30, 1984, 98 Stat. 3171—which is not relevant to our consideration of this case—corrected the error by substituting the word "descend" for "descedent" in § 207. The Senate Report accompanying the Act described how "descedent" made its way into the 1983 statute: "[T]he bill actually voted on by the House and Senate was garbled in the printing. It was this garbled version of Title II that was signed by the President." S. Rep. No. 98–632, p. 2 (1984).

total acreage in such tract and has earned to its owner less than $100 in the preceding year before it is due to escheat."

In the text of the Act, Congress took pains to specify that fractional interests acquired by a tribe pursuant to an approved plan must be purchased at a fair price. See §§ 204, 205, and 206. There is no comparable provision in § 207. The text of the Act also does not explain why Congress omitted a grace period for consolidation of the fractional interests that were to escheat to the tribe pursuant to that section.

The statute was signed into law on January 12, 1983, and became effective immediately. On March 2, the Bureau of Indian Affairs of the Department of the Interior issued a memorandum to all its area directors to advise them of the enactment of § 207 and to provide them with interim instructions pending the promulgation of formal regulations. The memorandum explained:

> "Section 207 effects a major change in testate and intestate heirship succession for certain undivided fractional interests in trust and restricted Indian land. Under this section, certain interests in land, as explained below, will no longer be capable of descending by intestate succession or being devised by will. Such property interests will, upon the death of the current owner, escheat to the tribe. . . .

> . . . . .

> "Because Section 207 of P. L. 97–459 constitutes a major change in Indian heirship succession, Area Offices and Agencies are urged to provide all Indian landowners under their jurisdiction with notice of its effects."[5]

The memorandum then explained how Indian landowners who wanted their heirs or devisees, rather than the tribe, to

---

[5] App. to Juris. Statement 38a–39a.

acquire their fractional interests could avoid the impact of § 207. It outlined three ways by which the owner of a fractional interest of less than two percent of a tract could enlarge that interest to more than two percent.[6]

The three appellees—Mary Irving, Patrick Pumpkin Seed, and Eileen Bissonette—are enrolled members of the Oglala Sioux Tribe. They represent heirs or devisees of members of the Tribe who died in March, April, and June 1983.[7] At the time of their deaths, the decedents owned 41 fractional interests subject to the provisions of § 207. App. 20, 22–28, 32–33, 37–39. The size and value of those interests varied widely—the smallest was a $1/3645$ interest in a 320-acre tract, having an estimated value of only $12.30, whereas the largest was the equivalent of $3\frac{1}{2}$ acres valued at $284.44. *Id.*, at 22 and 23. If § 207 is valid, all of those interests escheated to the Tribe; if § 207 had not been enacted—or if it is invalid— the interests would have passed to appellees.

---

[6] The memorandum stated:

"To assure the effectiveness of a will or heirship succession under state law, any Indian owner within the above category (if he or she is concerned that the tribe rather than his or her heirs or devisees will take these interests) may purchase additional interests from coowners pursuant to 25 CFR 151.7 and thereby increase his/her ownership interest to more than two percent. Another alternative is for such an owner to convey his/her interest to coowners or relatives pursuant to 25 CFR 152.25 and reserve a life estate, thus retaining the benefits of the interest while assuring its continued individual, rather than tribal, ownership. A third alternative, if feasible, is to partition the tract in such a way as to enlarge the owner's interest in a portion of said tract.

"Indians falling within the above category and who are presently occupying, or in any other way using, the tract in question should especially be advised of the aforementioned alternatives." *Id.*, at 39a–40a.

[7] Mary Irving is the daughter of Chester Irving who died on March 18, 1983, see App. 18; Eileen Bissonette is the guardian for the five minor children of Geraldine Mary Poor Bear-Little Hoop Cross who died on March 23, 1983, see *id.*, at 21; and Patrick Pumpkin Seed is the son of Charles Leroy Pumpkin Seed who died on April 2, 1983, see *id.*, at 34, and the nephew of Edgar Pumpkin Seed who died on June 23, 1983.

## II

I agree with the Court's explanation of why these appellees "can appropriately serve as their decedents' representatives for purposes of asserting the latters' Fifth Amendment rights." *Ante,* at 711–712. But the reason the Court asserts for finding that § 207 effects a taking is not one that appellees press, or could press, on behalf of *their* decedents. A substantial gap separates the claims that the Court allows these appellees to advance from the rationale that the Court ultimately finds persuasive.

The Court's grant of relief to appellees based on the rights of hypothetical decedents therefore necessarily rests on the implicit adoption of an overbreadth analysis that has heretofore been restricted to the First Amendment area. The Court uses the language of takings jurisprudence to express its conclusion that § 207 violates the Fifth Amendment, but the stated reason is that § 207 "goes too far," see *ante,* at 718, because it might interfere with testamentary dispositions, or inheritances, that result in the consolidation of property interests rather than their increased fractionation.[8] That reasoning may apply to some decedents, but it does not apply to these litigants' decedents. In one case, the property of Mary Poor Bear-Little Hoop Cross was divided among her five children. In two other cases, the fractional interests passed to the next generation.[9] I had thought it well settled

---

[8] The crux of the Court's holding is stated as follows:

"What is certainly not appropriate is to take the extraordinary step of abolishing both descent and devise of these property interests even when the passing of the property to the heir might result in consolidation of property. Accordingly, we find that this regulation, in the words of Justice Holmes, 'goes too far.'" *Ante,* at 718.

[9] Patrick Pumpkin Seed was a potential heir to four pieces of property in which both his father and his uncle had interests. However, because both his father and his uncle had other potential heirs, the net effect of the distribution of the uncle's and the father's estates would have been to increase the fractionalization of their property interests. Furthermore, even if the statute were considered invalid as applied to Patrick Pumpkin Seed, the

by our precedents that "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." *United States* v. *Raines*, 362 U. S. 17, 21 (1960) (citing cases). This rule rests on the wisdom that the "delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined." *Id.*, at 22.[10] In order to

---

Court does not explain why it would also be considered invalid as applied to Mary Irving and Eileen Bissonette.

[10] We have made a limited exception to this rule when a "statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick* v. *Oklahoma*, 413 U. S. 601, 612 (1973). This exception does not apply to § 207. Even if overbreadth analysis were appropriate in a case outside of the First Amendment area, the Court's use of it on these facts departs from precedent. The Court generally does not grant relief unless there has been a showing that the invalid applications of the statute represent a substantial portion of its entire coverage. "[W]e believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.*, at 615. See also *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 799 (1984) (requirement of substantiality prevents overbreadth doctrine from abolishing ordinary standing requirements); *New York* v. *Ferber*, 458 U. S. 747, 767–771 (1982) (a law should not be invalidated as overbroad unless it is substantially so). As I wrote in *New York* v. *Ferber:*

"My reasons for avoiding overbreadth analysis in this case are more qualitative than quantitative. When we follow our traditional practice of adjudicating difficult and novel constitutional questions only in concrete factual situations, the adjudications tend to be crafted with greater wisdom. Hypothetical rulings are inherently treacherous and prone to lead us into unforeseen errors; they are qualitatively less reliable than the products of case-by-case adjudication." *Id.*, at 780–781 (opinion concurring in judgment).

Section 207 is obviously not "substantially overbroad." The notion that a regulatory statute unrelated to freedom of expression is invalid simply because the conditions prompting its enactment are not present in every situation to which it applies is a startling doctrine for which the Court cites no authority.

review the judgment of the Court of Appeals granting relief to these litigants, an analysis different from the Court's novel overbreadth approach is required.

## III

The Secretary argues that special features of this legislation make it a reasonable exercise of Congress' power to regulate Indian property interests. The Secretary does not suggest that it is generally permissible to modify the individual's presently recognized right to dispose of his property at death without giving him a reasonable opportunity to make *inter vivos* dispositions that will avoid the consequences of a newly enacted change in the laws of intestacy and testamentary disposition. The Secretary does not even contend that this power is unlimited as applied to the property of Indians. Rather, the Secretary contends that § 207 falls within the permissible boundaries of legislation that may operate to limit or extinguish property rights. The Secretary places great emphasis on the minimal value of the property interests affected by § 207, the legitimacy of the governmental purpose in consolidating such interests, and the fact that the tribe, rather than the United States, is the beneficiary of the so-called "escheat." These points, considered in turn and as a whole, provide absolutely no basis for reversing the judgment of the Court of Appeals.

The value of a property interest does not provide a yardstick for measuring "the scope of the dual constitutional guarantees that there be no taking of property without just compensation, and no deprivation of property without the due process of law." *Texaco, Inc.* v. *Short*, 454 U. S. 516, 540–541 (1982) (BRENNAN, J., dissenting). The sovereign has no license to take private property without paying for it and without providing its owner with any opportunity to avoid or mitigate the consequences of the deprivation simply because the property is relatively inexpensive. *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419, 436–

437, and 438, n. 16 (1982). The Fifth Amendment draws no distinction between grand larceny and petty larceny.

The legitimacy of the governmental purposes served by § 207 demonstrates that the statute is not arbitrary, see *Delaware Tribal Business Committee* v. *Weeks*, 430 U. S. 73 (1977), and that the alleged "taking" is for a valid "public use" within the meaning of the Fifth Amendment. Those facts, however, do not excuse or mitigate whatever obligation to pay just compensation arises when an otherwise constitutional enactment effects a taking of property. Nor does it lessen the importance of giving a property owner fair notice of a major change in the rules governing the disposition of his property.

The fact that § 207 provides for an "escheat" to the tribe rather than to the United States does not change the unwarned impact of the statute on an individual Indian who wants to leave his property to his children. The statute takes the disposition of decedent's fractional land interests out of the control of the decedent's will or the laws of intestate succession; whether the United States or the tribe retains the property, the landowner's loss is the same. The designation of the tribe as beneficiary is an essential feature, however, in two respects. Since the tribe is the beneficiary, its own interests conflict with its duty to bring the workings of the statute to the attention of the property owner. In addition, the designation of the tribe as beneficiary highlights the inappropriateness of the majority's takings analysis. The use of the term "escheat" in § 207 differs in a substantial way from the more familiar uses of that term. At common law the property of a person who died intestate and without lawful heirs would escheat to the sovereign; thus the doctrine provided a mechanism for determining ownership of what otherwise would have remained abandoned property. In contrast, under § 207 the statutory escheat supersedes the rights of claimants who would otherwise inherit the property; it allocates property between two contending parties.

Section 207 differs from more conventional escheats in another important way. It contains no provisions assuring that the property owner was given a fair opportunity to make suitable arrangements to avoid the operation of the statute. Legislation authorizing the escheat of unclaimed property, such as real estate, bank accounts, and other earmarked funds, typically provides as a condition precedent to the escheat an appropriate lapse of time and the provision of adequate notice to make sure that the property may fairly be treated as abandoned.[11] Similarly, interpleader proceedings in District Court provide procedural safeguards, including an opportunity to appear, for those whose rights will be affected by the judgment. See 28 U. S. C. § 1335; Fed. Rule Civ. Proc. 22. The statute before us, in contrast, contained no such mechanism, apparently relying on the possibility that appellees' decedents would simply learn about the statute's consequences one way or another.

While § 207 therefore does not qualify as an escheat of the kind recognized at common law, it might be regarded as a statute imposing a duty on the owner of highly fractionated interests in allotted lands to consolidate his interests with

---

[11] For example, the Government both provides a grace period and bears an affirmative responsibility to prevent escheat in the distribution of funds to which enrolled members of the Peoria Tribe are statutorily entitled under 84 Stat. 688, 25 U. S. C. § 1222. See 25 U. S. C. § 1226 ("Any per capita share, whether payable to a living enrollee or to the heirs or legatees of a deceased enrollee, which the Secretary of the Interior is unable to deliver within two years after the date the check is issued . . . shall revert to the Peoria Tribe").

State statutes governing abandoned property typically provide for a grace period and notice. See, e. g., N. Y. Aband. Prop. Law §§ 300–302 (McKinney 1944 and Supp. 1987) (property held by banking organizations); Ill. Rev. Stat., ch. 141, ¶¶ 102, 112 (1985) (property held by banking or financial organizations). Statutes governing the escheat of property of decedents intestate and without heirs also provide for notice and an opportunity for interested parties to assert their claims. See, e. g., Cal. Civ. Proc. Code Ann. §§ 1420, 1423 (West 1982); Tex. Prop. Code Ann. §§ 71.101–71.106 (1984 and Supp. 1987).

those of other owners of similar interests. The method of enforcing such a duty is to treat its nonperformance during the owner's lifetime as an abandonment of the fractional interests. This release of dominion over the property might justify its escheat to the use of the sovereign.

Long ago our cases made it clear that a State may treat real property as having been abandoned if the owner fails to take certain affirmative steps to protect his ownership interest. We relied on these cases in upholding Indiana's Mineral Lapse Act, a statute that extinguished an interest in coal, oil, or other minerals that had not been used for 20 years:

> "These decisions clearly establish that the State of Indiana has the power to enact the kind of legislation at issue. In each case, the Court upheld the power of the State to condition the retention of a property right upon the performance of an act within a limited period of time. In each instance, as a result of the failure of the property owner to perform the statutory condition, an interest in fee was deemed as a matter of law to be abandoned and to lapse." *Texaco, Inc.* v. *Short,* 454 U. S., at 529.

It is clear, however, that a statute providing for the lapse, escheat, or abandonment of private property cannot impose conditions on continued ownership that are unreasonable, either because they cost too much or because the statute does not allow property owners a reasonable opportunity to perform them and thereby to avoid the loss of their property. In the *Texaco* case, both conditions were satisfied: The conditions imposed by the Indiana Legislature were easily met,[12]

---

[12] "It is also clear that the State has not exercised this power in an arbitrary manner. The Indiana statute provides that a severed mineral interest shall not terminate if its owner takes any one of three steps to establish his continuing interest in the property. If the owner engages in actual production, or collects rents or royalties from another person who does or proposes to do so, his interest is protected. If the owner pays taxes, no matter how small, the interest is secure. If the owner files a written statement of claim in the county recorder's office, the interest remains via-

and the 2-year grace period included in the statute foreclosed any argument that mineral owners did not have an adequate opportunity to familiarize themselves with the terms of the legislation and to comply with its provisions before their mineral interests were extinguished. As the Court recognized in *United States* v. *Locke*, 471 U. S. 84, 106, n. 15 (1985), "[l]egislatures can enact substantive rules of law that treat property as forfeited under conditions that the common law would not consider sufficient to indicate abandonment." These rules, however, are only reasonable if they afford sufficient notice to the property owners and a reasonable opportunity to comply. *Ibid.*

The Due Process Clause of the Fifth Amendment thus applies to § 207's determination of which acts and omissions may validly constitute an abandonment, just as the Takings Clause applies to whether the statutory escheat of property must be accompanied by the payment of just compensation.[13] It follows, I believe, that § 207 deprived decedents of due process of law by failing to provide an adequate "grace period" in which they could arrange for the consolidation of fractional interests in order to avoid abandonment. Because the statutory presumption of abandonment is invalid under the precise facts of this case, I do not reach the ground relied upon by the Court of Appeals—that the resulting escheat of

---

ble. Only if none of these actions is taken for a period of 20 years does a mineral interest lapse and revert to the surface owner." 454 U. S., at 529.

It would appear easier for the owner of a mineral interest to meet these conditions than for appellees' decedents to meet the implicit conditions imposed by § 207. Paying taxes or filing a written statement of claim are simple and unilateral acts, but an Indian owner of a fractional interest cannot consolidate interests or collect $100 per annum from it without the willing participation of other parties.

[13] The Fifth Amendment to the Constitution provides that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

abandoned property would effect a taking of private property for public use without just compensation.[14]

Critical to our decision in *Texaco* was the fact that an owner could readily avoid the risk of abandonment in a variety of ways,[15] and the further fact that the statute afforded the affected property owners a reasonable opportunity to familiarize themselves with its terms and to comply with its provisions. We explained:

> "The first question raised is simply how a legislature must go about advising its citizens of actions that must be taken to avoid a valid rule of law that a mineral interest that has not been used for 20 years will be deemed to be abandoned. The answer to this question is no different from that posed for any legislative enactment affecting substantial rights. Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply. In this case, the 2-year grace period included in the Indiana statute forecloses any argument that the statute is invalid because mineral owners may not have had an opportunity to become familiar with its terms. It is well established that persons owning property within a State are charged with knowledge of relevant statutory provisions affecting the

---

[14] I am unable to join the Court's largely inapposite Fifth Amendment takings analysis. As I have demonstrated, the statute, analogous to those authorizing the escheat of abandoned property, is rooted in the sovereign's authority to oversee and supervise the transfer of property ownership. Instead of analyzing § 207 in relation to our precedents recognizing and limiting the exercise of such authority, however, the Court ignores this line of cases, implicitly questions their validity, and appears to invite widespread challenges under the Fifth Amendment Takings Clause to a variety of statutes of the kind that we upheld in *Texaco v. Short*.

[15] See n. 12, *supra*.

control or disposition of such property."   454 U. S., at
531–532.[16]

Assuredly Congress has ample power to require the own-
ers of fractional interests in allotted lands to consolidate their
holdings during their lifetimes or to face the risk that their
interests will be deemed to have been abandoned.   But no
such abandonment may occur unless the owners have a fair
opportunity to avoid that consequence.   In this case, it is
palpably clear that they were denied such an opportunity.

This statute became effective the day it was signed into
law.   It took almost two months for the Bureau of Indian
Affairs to distribute an interim memorandum advising its
area directors of the major change in Indian heirship suc-
cession effected by § 207.   Although that memorandum iden-
tified three ways in which Indian landowners could avoid the
consequences of § 207, it is not reasonable to assume that ap-
pellees' decedents—who died on March 18, March 23, April 2,
and June 23, 1983—had anything approaching a reasonable

---

[16] Earlier in the opinion we noted that in *Wilson* v. *Iseminger*, 185 U. S.
55 (1902), the Court had upheld a Pennsylvania statute that provided for
the extinguishment of certain interests in realty "since the statute con-
tained a reasonable grace period in which owners could protect their
rights."   454 U. S., at 527, n. 21.   We quoted the following passage from
the *Wilson* case:

"It may be properly conceded that all statutes of limitation must proceed
on the idea that the party has full opportunity afforded him to try his right
in the courts.   A statute could not bar the existing rights of claimants
without affording this opportunity; if it should attempt to do so, it would
not be a statute of limitations, but an unlawful attempt to extinguish rights
arbitrarily, whatever might be the purport of its provisions.   It is essen-
tial that such statutes allow a reasonable time after they take effect for the
commencement of suits upon existing causes of action; though what shall be
considered a reasonable time must be settled by the judgment of the legis-
lature, and the courts will not inquire into the wisdom of its decision in
establishing the period of legal bar, unless the time allowed is manifestly
so insufficient that the statute becomes a denial of justice."   185 U. S.,
at 62–63.

opportunity to arrange for the consolidation of their respective fractional interests with those of other owners.[17] With respect to these appellees' decedents, "the time allowed is manifestly so insufficient that the statute becomes a denial of justice." *Wilson* v. *Iseminger*, 185 U. S. 55, 63 (1902).[18]

While citizens "are presumptively charged with knowledge of the law," *Atkins* v. *Parker*, 472 U. S. 115, 130 (1985), that presumption may not apply when "the statute does not allow a sufficient 'grace period' to provide the persons affected by a change in the law with an adequate opportunity to become familiar with their obligations under it." *Ibid.* (citing *Texaco, Inc.*, 454 U. S., at 532). Unlike the food stamp recipients in *Parker*, who received a grace period of over 90 days and individual notice of the substance of the new law, 472 U. S., at 130–131, the Indians affected by § 207 did not receive a reasonable grace period. Nothing in the record suggests that appellees' decedents received an adequate opportunity to put their affairs in order.[19]

---

[17] The legislative history of the Indian Land Consolidation Act of 1983 is mute with respect to § 207. See n. 4, *supra*. This silence is illuminating; it suggests that Indian landowners cannot reasonably be expected to have received notice about the statute before it took effect and to have arranged their affairs accordingly. The lack of legislative history concerning § 207 also demonstrates that Congress paid scant or no attention to whether, in light of its longstanding fiduciary obligation to Indians, it was constitutionally required to afford a reasonable postenactment "grace period" for compliance.

[18] A statute which denies the affected party a reasonable opportunity to avoid the consequences of noncompliance may work an injustice similar to that of invalid retroactive legislation. In both instances, the party who "could have anticipated the potential liability attaching to his chosen course of conduct would have avoided the liability by altering his conduct." *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 17, n. 16 (1976) (citing *Welch* v. *Henry*, 305 U. S. 134, 147 (1938)). See also *United States* v. *Hemme*, 476 U. S. 558, 568–569 (1986) (following *Welch* v. *Henry, supra*).

[19] Nothing in the record contradicts the possibility that appellees themselves only became aware of the statute upon receiving notices that hearings had been scheduled for the week of October 24, 1983, to determine if their Tribe had a right through escheat to any lands that might other-

The conclusion that Congress has failed to provide appellees' decedents with a reasonable opportunity for compliance implies no rejection of Congress' plenary authority over the affairs and the property of Indians. The Constitution vests Congress with plenary power "to deal with the special problems of Indians." *Morton* v. *Mancari*, 417 U. S. 535, 551 (1974). As the Secretary acknowledges, however, the Government's plenary power over the property of Indians "is subject to constitutional limitations." Brief for Appellant 24–25. The Due Process Clause of the Fifth Amendment required Congress to afford reasonable notice and opportunity for compliance to Indians that § 207 would prevent fractional interests in land from descending by intestate or testate succession.[20] In omitting any opportunity at all for owners of fractional interests to order their affairs in light of § 207, Congress has failed to afford the affected Indians the due process of law required by the Fifth Amendment.

Accordingly, I concur in the judgment.

---

wise have passed to appellees. *Irving* v. *Clark*, 758 F. 2d 1260, 1262 (CA8 1985). The notices were issued on October 4, 1983, after the death of appellees' decedents, and therefore afforded no opportunity for decedents to comply with § 207 or for appellees to advise their decedents of the possibility of escheat.

[20] I need express no view on the constitutionality of § 207 as amended by the Act of Oct. 30, 1984, 98 Stat. 3171. All of the interests of appellees' decedents at issue in this case are governed by the original version of § 207. The decedents all died between January 12, 1983, and October 30, 1984, the period in which the original version of § 207 was in effect. The parties in this case present no case or controversy with respect to the application of the *amended* version of § 207.