**PUBLISH**
**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 26, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLIC SERVICE COMPANY OF NEW
MEXICO, a New Mexico corporation,

     Plaintiff - Appellant,

v.

LORRAINE BARBOAN, a/k/a, Larene H.
Barboan; BENJAMIN HOUSE, also
known as, BENNIE HOUSE; ANNIE H.
SORRELL, also known as, ANNA H.
SORRELL; MARY ROSE HOUSE, also
known as, MARY R. HOUSE; DOROTHY
HOUSE, also known as, DOROTHY W.
HOUSE; LAURA H. LAWRENCE, also
known as, LAURA H. CHACO; JONES
DEHIYA; JIMMY A. CHARLEY, also
known as, JIM A. CHARLEY; MARY
GRAY CHARLEY, also known as, MARY
B. CHARLEY; BOB GRAY, Deceased,
also known as, BOB GREY; CHRISTINE
GRAY BEGAY, also known as,
CHRISTINE G. BEGAY; THOMAS
THOMPSON GRAY, also known as,
THOMAS GREY; JIMMIE GREY, also
known as, JIMMIE GRAY; MELVIN L.
CHARLES, also known as, MELVIN L.
CHARLEY; MARLA L. CHARLEY, also
known as, MARLA CHARLEY; KALVIN
A. CHARLEY; IRENE WILLIE, also
known as, IRENE JAMES WILLIE;
CHARLEY JOE JOHNSON, also known
as, CHARLEY J. JOHNSON; ELOUISE J.
SMITH; LEONARD WILLIE; SHAWN
STEVENS; GLEN CHARLES
CHARLESTON, also known as, GLEN C.

No. 16-2050

CHARLESTON; GLENDA BENALLY, also known as, GLENDA G. CHARLESTON; NAVAJO NATION; UNITED STATES OF AMERICA,

Defendants - Appellees,

and

APPROXIMATELY 15.49 ACRES OF LAND IN MCKINLEY COUNTY, NEW MEXICO; NAVAJO TRIBAL UTILITY AUTHORITY; CONTINENTAL DIVIDE ELECTRIC COOPERATIVE, INC.; TRANSWESTERN PIPELINE COMPANY, LLC; CITICORP NORTH AMERICA, INC.; CHEVRON USA INC., as successor in interest to Gulf Oil Corp.; HARRY HOUSE, Deceased; PAULINE H. BROOKS; LEO HOUSE, JR.; NANCY DEHEVA ESKEETS; LORRAINE SPENCER; LAURA A. CHARLEY; MARILYN RAMONE; WYNEMA GIBERSON; EDDIE MCCRAY, also known as, EDDIE R. MCCRAE; ETHEL DAVIS, also known as, ETHEL B. DAVIS; WESLEY E. CRAIG; HYSON CRAIG; NOREEN A. KELLY; ELOUISE ANN JAMES, also known as, ELOUISE JAMES WOOD, also known as, ELOISE ANN JAMES, also known as, ELOUISE WOODS; ALTA JAMES DAVIS, also known as, ALTA JAMES; ALICE DAVIS, also known as, ALICE D. CHUYATE; PHOEBE CRAIG, also known as, PHOEBE C. COWBOY; NANCY JAMES, also known as, NANCY JOHNSON; BETTY JAMES, Deceased; LINDA C. WILLIAMS, also known as, LINDA CRAIG-WILLIAMS; GENEVIEVE V. KING; LESTER CRAIG; FABIAN JAMES; DAISY YAZZIE CHARLES, also known as, DAISY YAZZIE, also known

2

as, DAISY J. CHARLES; ROSIE YAZZIE, Deceased; KATHLEEN YAZZIE JAMES, also known as, CATHERINE R. JAMES; VERNA M. CRAIG; JUANITA SMITH, also known as, JUANITA R. ELOTE; ALETHEA CRAIG, SARAH NELSON, LARRY DAVIS, JR.; BERDINA DAVIS; MICHELLE DAVIS; STEVEN MCCRAY; VELMA YAZZIE; GERALDINE DAVIS; LARRISON DAVIS, also known as, LARRISON P. DAVIS; ADAM MCCRAY; MICHELLE MCCRAY; EUGENIO TY JAMES; LARSON DAVIS; CORNELIA A. DAVIS; CELENA DAVIS, also known as, CELENA BRATCHER; FRANKIE DAVIS;  VERNA LEE BERGEN CHARLESTON, also known as, VERNA L. CHARLESTON; VERN CHARLESTON; KELLY ANN CHARLESTON, also known as, KELLY A. CHARLESTON; SHERYL LYNN CHARLESTON, also known as, SHERYL L. CHARLESTON; SPENCER KIMBALL CHARLESTON, JR., Deceased; EDWIN ALLEN CHARLESTON, also known as, EDWIN A. CHARLESTON; CHARLES BAKER CHARLESTON, also known as, CHARLES B. CHARLESTON; SAM MARIANO; HARRY  HOUSE, JR; MATILDA JAMES; DARLENE YAZZIE; UNKNOWN OWNERS, CLAIMANTS AND HEIRS OF THE PROPERTY INVOLVED; UNKNOWN HEIRS OF HARRY HOUSE, Deceased; UNKNOWN HEIRS OF BOB GRAY (BOB GREY), Deceased; UNKNOWN HEIRS OF BETTY JAMES, Deceased; UNKNOWN HEIRS OF ROSIE C. YAZZIE, Deceased; UNKNOWN HEIRS OF SPENCER KIMBALL CHARLESTON, JR., (SPENCER K. CHARLESTON),

3

Deceased; UNKNOWN HEIRS OF
HELEN M. CHARLEY, Deceased;
ESTATE OF ROSIE C. YAZZIE;
ESTATE OF SPENCER K.
CHARLESTON; UNITED STATES
DEPARTMENT OF HEALTH &
HUMAN SERVICES; UNITED STATES
DEPARTMENT OF THE INTERIOR,

    Defendants.

------------------------------

GPA MIDSTREAM ASSOCIATION;
THE NATIONAL CONGRESS OF
AMERICAN INDIANS; PUEBLO OF
LAGUNA; THE UTE MOUNTAIN UTE
TRIBE; THE CONFEDERATED TRIBES
OF THE UMATILLA INDIAN
RESERVATION, TRANSWESTERN
PIPELINE COMPANY, LLC,

    Amici Curiae.

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:15-CV-00501-JAP-CG)**

_____

Kirk R. Allen (Stephen B. Waller, with him on the briefs), Miller Stratvert P.A., Albuquerque, New Mexico, for Plaintiff-Appellant.

Paul Spruhan, Assistant Attorney General (Ethel Branch, Attorney General, with him on the brief), Navajo Nation Department of Justice, Window Rock, Arizona, for Navajo Nation, Defendant-Appellee.

Jeffrey S. Beelaert (John C. Cruden, Assistant Attorney General, James C. Kilbourne, William B. Lazarus, and Mary Gabrielle Sprague, Attorneys, with him on the brief), U.S. Department of Justice, Washington, D.C., for the United States, Defendant-Appellee.

4

Zackeree S. Kelin (Michael M. Mulder, The Law Offices of Michael M. Mulder, Evanston, Illinois, with him on the brief), Davis Kelin Law Firm LLC, Albuquerque, New Mexico, for the Individual Allottees, Defendants-Appellees.

Clint Russell and Stratton Taylor, Taylor, Foster, Mallett, Downs Ramsey & Russell, Claremore, Oklahoma, filed an amicus brief for GPA Midstream Association, in support of Plaintiff-Appellant.

Jennifer H. Weddle, Troy A. Eid, Harriet McConnell, and Laura E. Jones, Greenberg Traurig, LLP, Denver, Colorado, for Ute Mountain Ute Tribe; John Dossett, National Congress of American Indians, Embassy of Trial Nations, Washington, D.C.; Dan Rey-Bear, Rey-Bear McLaughlin, LLP, Spokane, Washington, for Pueblo of Laguna; Naomi Stacy and Dan Hester, for Confederated Tribes of the Umatilla Indian Reservation, Pendleton, Oregon, Amici Curiae.

Deana M. Bennett and Emil J. Kiehne, Modrall Sperling Roehl Harris & Sisk, PA, Albuquerque, New Mexico, filed an amicus brief for Transwestern Pipeline Company, LLC, in support of Plaintiff-Appellant.

_____

Before **BACHARACH**, **PHILLIPS**, and **McHUGH**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

Unable to win the consent of all necessary landowners, a public utility company now contends that it has a statutory right to condemn a right-of-way on two parcels of land in New Mexico. Because federal law does not permit condemnation of tribal land, the Navajo Nation's ownership of undivided fractional interests in the parcels presents a problem for the company. We affirm the district court's dismissal of the condemnation action against the two land parcels in which the Navajo Nation holds an interest.

I

No one can feign surprise to learn that the United States government's treatment of the original inhabitants of this country has not been a model of justice. The government spent much of the nineteenth century emptying the eastern part of the country of Indians and sending them west. *See Choctaw Nation v. Oklahoma*, 397 U.S. 620, 623-26 (1970). Then, when settlers caught up with the tribes in the west, the government sought to confine those tribes, and other tribes native to the west, ever more tightly onto reservations. *See, e.g.*, *Williams v. Lee*, 358 U.S. 217, 221-23 (1959). Much tragedy and bloodshed ensued.

In the late nineteenth century, after the government had largely segregated Indians from the rest of society, Congress changed course. But the new course still harmed Indian tribes and their members. Instead of excluding tribal members from American society while permitting them some autonomy on the reservations, Congress tried to force tribes to assimilate into American society, minus much of their autonomy. Congress carved reservations into allotments and assigned the land parcels to tribal members—surplus lands were made available to white settlers. So began the Allotment Era. "The objectives of allotment were simple and clear cut: to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large." *Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 254 (1992). The Allotment Era "was fueled in part by the belief that individualized farming would speed the Indians' assimilation into American society and in part by the continuing demand for

new lands for the waves of homesteaders moving West." *Solem v. Bartlett*, 465 U.S. 463, 466 (1984).

Congress began allotting land one tribe at a time and allowed Indians to sell the land as soon as they received it. *Cty. of Yakima*, 502 U.S. at 254. Tribal members began to lose their allotted lands in hasty and even fraudulent transactions. *Id.* In 1887, Congress passed the General Allotment Act, commonly known as the Dawes Act, which allowed the President to apply the allotment process to most tribal lands across the country, without tribal consent. *Id.* But as a check against the rapid post-allotment loss of Indian land, Congress also mandated that the federal government would hold Indian-allotted land in trust for twenty-five years, after which time it would issue a fee patent to the allottee or his heirs. *Id.*

Despite this attempted protection, "[t]he policy of allotment of Indian lands quickly proved disastrous for the Indians." *Hodel v. Irving*, 481 U.S. 704, 707 (1987). As allotments spread throughout the country, Indians continued to lose land—by the time the Allotment Era ended in 1934, as much as two-thirds of allotted lands had passed out of Indian ownership. Felix S. Cohen, *Cohen's Handbook of Federal Indian Law* § 1.04 (Nell Jessup Newton, et al. eds., 2012 ed.). Even the twenty-five-year trust protection did serious harm: "parcels became splintered into multiple undivided interests in land, with some parcels having hundreds . . . of owners. Because the land was held in trust and often could not be alienated or partitioned, the fractionation problem grew and grew over time." *Hodel*, 481 U.S. at 707.

As allotments began to create a checkerboard of tribal, individual Indian, and individual non-Indian land interests, Congress passed several right-of-way statutes to help ensure that necessities such as telegraph lines and roads could continue without encumbrance. *See United States v. Okla. Gas & Elec. Co.*, 127 F.2d 349, 352 (10th Cir. 1942), *aff'd*, 318 U.S. 206 (1943). In 1901, Congress passed one such Act. Act of March 3, 1901, ch. 832, 31 Stat. 1058 (the Act). The Act's most relevant section for our purposes, which is codified at 25 U.S.C. § 357, lies at the center of this appeal:

> Lands allotted in severalty to Indians may be condemned for any public purpose under the laws of the State or Territory where located in the same manner as land owned in fee may be condemned, and the money awarded as damages shall be paid to the allottee.

*Id.* § 3, 31 Stat. 1084 (codified as amended at 25 U.S.C. § 357).

In construing § 357's meaning, it helps to compare the Act's preceding paragraph. *Id.* § 3, 31 Stat. 1083 (codified as amended at 25 U.S.C. § 319). Unlike § 357, § 319 limited the tribes' exclusive use of tribal lands. Section 319 gave the Secretary of the Interior authority to grant rights-of-way for telephone and telegraph lines through Indian reservations, through lands held by Indian tribes or nations in the former Indian Territory, through lands reserved for Indian agencies or schools, and "through any lands which have been allotted in severalty to any individual Indian under any law or treaty." *Id.*

In comparison, § 357 does not mention any condemnation authority for rights-of-way through Indian reservations and other types of non-allotted tribal lands. And even without that context, we see no language in § 357 that authorizes condemnation of tribal land, a result Congress has full power to order if it chooses. *Cherokee Nation v. S. Kan.*

8

*Ry. Co.*, 135 U.S. 641, 656-57 (1890). Thus, as we have noted, "a plain and clear distinction" exists "between the granting of rights-of-way over and across reservations or tribal lands and those allotted in severalty to restricted Indians." *Okla. Gas & Elec. Co.*, 127 F.2d at 354.

Perhaps the failure to authorize condemnation of tribal lands stemmed from a belief that doing so was unnecessary. After all, the Congresses of the Allotment Era "anticipated the imminent demise of the reservation." *Solem*, 465 U.S. at 468. What need would a party have to condemn tribal land if soon no tribal lands would exist? And yet Congress has never enlarged § 357's condemnation authority even after it has become clear that tribes and reservations are here to stay.

In 1934, Congress again shifted course on Indian affairs. But this time, perhaps for the first time in American history, the congressional pendulum swung decisively toward favoring tribal sovereignty. The 1934 Indian Reorganization Act ended the Allotment Era—Congress halted allotments, began restoring unallotted surplus land to tribal ownership, and indefinitely extended the twenty-five-year trust period for allotted lands. Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. §§ 5101-5144); *Cty. of Yakima*, 502 U.S. at 255. Extensive federal efforts later even began to help tribes buy back lost land—efforts that continue to this day. *See, e.g.*, Indian Land Consolidation Act, Pub. L. No. 97-459, 96 Stat. 2515 (1983) (codified as amended at 25 U.S.C. §§ 2201-2221) (setting up mechanisms to consolidate tribal holdings); Claims Resolution Act of 2010, Pub. L. No. 111-291, 124 Stat. 3064, 3066-3067 (authorizing a $1.9 billion land buy-back program for tribal nations). Among other

avenues, tribes may now purchase interests in previously allotted lands, 25 U.S.C. § 2212, or inherit less than five percent of an undivided ownership interest through intestate descent, 25 U.S.C. § 2206(a)(2)(D). And so the tribes and reservations that the Allotment Era Congresses expected to wither away instead endured.

## II

That history produced, and informs, the case before us. In 1919, the federal government allotted 160 acres in New Mexico, known as Allotment 1160, to a man named Hostine Sauce, who later became known as Leo Frank, Sr. In 2006, through two conveyances from beneficial owners as authorized by the Indian Land Consolidation Act, the Navajo Nation acquired an undivided 13.6% interest in Allotment 1160. Similarly, in 1921, the federal government allotted another 160 acres in New Mexico, known as Allotment 1392, to a person named Wuala. In 2009, through intestate descent as authorized by the Indian Land Consolidation Act, the Navajo Nation acquired an undivided 0.14% interest in Allotment 1392. Both allotments are within the exterior boundaries of the Navajo Nation and have always had protected trust status.

Public Service Company of New Mexico (PNM) is a public utility company that in 1960 obtained a right-of-way from the federal Bureau of Indian Affairs (BIA)—an agency within the Department of the Interior—for an electric transmission line across the land now in dispute. The transmission line runs about sixty miles and crosses fifty-seven land parcels that were once allotted to individual Indians, including the two parcels in which the Navajo Nation now holds an undivided interest.

10

The right-of-way had a fifty-year expiration date—so it was set to expire in 2010. In November 2009, PNM applied to the Secretary of the Interior for a twenty-year renewal of the right-of-way. That application process was created by the 1948 Indian Right-of-Way Act, Act of Feb. 5, 1948, ch. 45, 62 Stat. 17-18 (codified at 25 U.S.C. §§ 323-328), which mandates that "[n]o grant of a right-of-way over and across any lands belonging to a tribe . . . shall be made without the consent of the proper tribal officials." 25 U.S.C. § 324. The regulations stemming from the 1948 Act affirm the necessity for tribal consent. *See, e.g.*, 25 C.F.R. § 169.107(a) (2016) ("For a right-of-way across tribal land, the applicant must obtain tribal consent, in the form of a tribal authorization and a written agreement with the tribe . . . ."). For land parcels held in trust for individual Indians, the Secretary of the Interior can grant rights-of-way so long as the holders of a majority of interests consent. 25 U.S.C. § 324.

The renewal process began smoothly for PNM. The Navajo Nation gave written consent for the right-of-way through lands in which the United States holds the entire interest in trust. In addition, PNM obtained consent from a majority of beneficial-interest owners for the parcels that had been allotted and in which the United States holds interest in trust. So in November 2009, the BIA began to process PNM's renewal application. But enough individual Indian owners in five land parcels revoked their consent to tip the total consenting to less than 50% of the fractional interests. In January 2015, the BIA notified PNM that it could not approve the renewal application without that consent.

On June 13, 2015, PNM filed a complaint in federal district court in New Mexico seeking to condemn the fifty-foot-wide right-of-way through the five parcels for which

11

the company no longer had consent. The complaint alleges federal-question jurisdiction under 28 U.S.C. § 1331, pleading a claim under § 3 of the 1901 Act, codified at 25 U.S.C. § 357. PNM alleged that § 357 authorizes the condemnation of any land ever allotted to Indians, whoever might later own the land. Unlike the twenty-year renewal period that PNM sought in the application process, PNM's complaint sought a perpetual right-of-way. The complaint named as defendants all parties holding interest in the five parcels, including the Navajo Nation and the United States.

In December 2015, the district court dismissed without prejudice—for lack of subject-matter jurisdiction—PNM's condemnation claims for the two parcels in which the Navajo Nation holds an interest. The court stayed the claims for the other three parcels pending the resolution of this appeal. The court held that § 357 does not authorize condemnation of land in which a tribe has acquired an interest. The court concluded that "[t]he Nation cannot be considered as an owner of 'lands allotted in severalty to Indians.'" Appellant App. vol. 1 at 137 (quoting 25 U.S.C. § 357). Tribal interest in the land ends allotted-land status.[1] The court reminded PNM that it could still pursue a voluntary easement.

Rather than take that course, PNM moved the court to reconsider and set aside the dismissal. Alternatively, PNM asked the district court to certify four interlocutory-appeal

---

[1] The district court also concluded that the Navajo Nation was a required party to the condemnation action under Fed. R. Civ. P. 19(a) because of the Nation's interest in the land to be condemned, but one that could not be joined because of sovereign immunity. And the court found that under Fed. R. Civ. P. 19(b), "in equity and good conscience" the condemnation action could not proceed without the Nation. Appellant App. vol. 1 at 155.

12

questions. In March 2016, the district court issued an order that affirmed its earlier decision and elaborated on its reasoning: "PNM's 'once an allotment always an allotment' rule is not supported by any case law authority or the plain language of § 357 and its historical context." Appellant App. vol. 2 at 304. In response to PNM's policy arguments about the negative consequences of not allowing condemnation, the court reminded PNM that, even if negotiation should fail—which the Navajo Nation and the United States argued PNM had not shown was inevitable—it was "up to Congress, not this Court, to open up the condemnation avenue over trust lands fractionally owned by tribes." *Id.* at 320.

The district court granted PNM's request to certify four questions of law for interlocutory appeal:

I.      Does 25 U.S.C. § 357 authorize a condemnation action against a parcel of allotted land in which the United States holds fee title in trust for an Indian tribe, which has a fractional beneficial interest in the parcel?

II.     Is an Indian tribe that holds a fractional beneficial interest in a parcel of allotted land a required party to a condemnation action brought under 25 U.S.C. § 357?

III.    Does an Indian tribe that holds a fractional beneficial interest in a parcel of allotted land have sovereign immunity against a condemnation action brought under 25 U.S.C. § 357?

IV.     If an Indian tribe that holds a fractional beneficial interest in a parcel of allotted land has sovereign immunity against, and cannot be joined in, a condemnation action brought under 25 U.S.C. § 357, can a condemnation action proceed in the absence of the Indian tribe?

*Id.* at 324.

13

The district court also denied PNM's request to sever the company's claims against the two parcels with Navajo Nation interests, concluding that it was better to stay the claims for the other three allotments pending the resolution of the interlocutory appeal. PNM has appealed the four certified questions.

## III

Because we affirm the district court's decision, we need reach only the first question certified for appeal: does § 357 authorize condemnation against land in which the United States holds fee title in trust for an Indian tribe, when the tribe has a fractional beneficial interest in the parcel?[2] We review de novo the district court's statutory interpretation of § 357. *United States v. Martinez*, 812 F.3d 1200, 1202 (10th Cir. 2015). But we also note an important canon of construction that applies to this case. "A well-established canon of Indian law states that 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1191 (10th Cir. 2002) (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985)).

---

[2] Though we need not reach the other questions raised on appeal, we note that the district court's orders provide thorough and well-reasoned bases to affirm on each. The court's orders are especially persuasive on the question of tribal immunity, which the court rightly observes must be abrogated unequivocally, not implicitly, by Congress. *See Nanomantube v. Kickapoo Tribe in Kan.*, 631 F.3d 1150, 1152 (10th Cir. 2011). PNM offers evidence of only implicit abrogation. We take note of this to demonstrate that even had PNM prevailed on the § 357 statutory question, it still would have had a long, difficult road ahead before its condemnation action could proceed.

14

In matters of statutory construction, we "must begin with the language employed by Congress" and assume that "the ordinary meaning of that language accurately expresses the legislative purpose," so we look to the plain language of § 357. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)). "Allotment" is an Indian-law term of art that refers to land awarded to an individual allottee from a common holding. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 142 (1972). No one disputes that PNM may seek condemnation of any land parcel previously allotted and whose current beneficial owners are individual Indians. The language of § 357 plainly authorizes such actions.

But starkly absent from § 357's language is any similar authorization for tribal lands. Tribal lands go unmentioned. As we have already noted, that absence in § 357 sharply contrasts with the paragraph immediately preceding § 357, which is part of the same section of the Act, but is codified at 25 U.S.C. § 319. Section 319 authorized the Secretary of the Interior to grant certain rights-of-way over reservations and other lands held by tribes, as well as allotted lands. *See* 25 U.S.C. § 319. And none of PNM's cited cases support its broad contention, let alone in this context, that "[f]or more than a century, the plain meaning of Section 357 has been that if a particular parcel is allotted land, that parcel may be condemned regardless of which persons or entities own fractional interests in such parcel." Appellant Opening Br. at 10; *see United States v. Clarke*, 445 U.S. 253, 254 (1980) (finding that § 357 authorizes condemnation via a formal procedure by the condemning authority, not by physical occupation and inverse

15

condemnation for compensation); *S. Cal. Edison Co. v. Rice*, 685 F.2d 354, 356 (9th Cir. 1982) (noting that § 357 treats individual Indian allottees like any other private landowners for condemnation purposes and finding that their lands are not in use for a public purpose). The statutory silence for condemnation of tribal lands, then, poses a serious obstacle for PNM.

PNM tries to circumvent that obstacle by asking us to make several implicit conclusions. First, it asks us to view what happened during the Allotment Era as a permanent brand on Native land: that upon Congress's taking tribal lands and chopping them into allotments, Congress forever rendered all those lands as "lands allotted" within § 357's meaning. Later changes in ownership cannot matter, PNM argues, and neither can the amount of the interest that a tribe acquires: in PNM's view, even lands that a tribe fully reobtains are "[l]ands allotted in severalty to Indians." 25 U.S.C. § 357. This is PNM's proposed rule that "once an allotment always an allotment"—rejected by the district court for lack of legal and historical backing. Appellant App. vol. 2 at 304. In support of this novel rule, PNM relies on the historical context underlying the 1901 Act. By PNM's reckoning, the Congresses of the Allotment Era wanted and expected tribes and reservations to soon be relics of the past—so they could hardly have expected that "any fractional beneficial interests would ever be transferred to the very tribe from whose reservation the lands had been removed by allotment." Appellant Opening Br. at 11.

Though we acknowledge the historical record, it provides us no license to disregard or slant § 357's plain language. Congress has neither enacted nor amended § 357 to establish that ever-allotted status would permanently trump any later tribal

16

acquisitions.[3] In a different setting, the Supreme Court has refused "to extrapolate from this expectation [of the demise of reservations]" an intent to diminish a reservation. *Solem*, 465 U.S. at 468. Likewise, here we refuse to extrapolate from that expectation to amend the plain language of § 357. Even if § 357 were ambiguous, we still would apply the Indian-law canon to rule in favor of tribal sovereignty and against a permanent anti-tribal-land classification. Section 357 does not reach tribal lands, even if land reobtains that status long after it was allotted.

## IV

We must next clarify what qualifies as tribal land for the purposes of § 357. We have ruled that § 357 reaches allotted land even after that land has passed to individual heirs of the allottees. *Transok Pipeline Co. v. Darks*, 565 F.2d 1150, 1153 (10th Cir. 1977). As explained above, we reject PNM's contention that any land ever allotted forever becomes "[l]ands allotted" within § 357's meaning, even when the tribe later fully reacquires and owns that land. But we still must decide what happens when tribes acquire a fractional interest. For the two mixed-ownership parcels at issue here, the Navajo Nation holds such fractional-ownership interests—a 13.6% interest in Allotment 1160, and a 0.14% interest in Allotment 1392.

---

[3] In our view, PNM's reading of § 357 requires inserting language that is not there, as shown by the missing language included in the brackets: "[All Tribal] Lands [ever] allotted in severalty to Indians [, regardless of whether they return to tribal ownership,] may be condemned for any public purpose under the laws of the State or Territory where located in the same manner as land owned in fee may be condemned, and the money awarded as damages shall be paid to the allottee."

In *Nebraska Public Power District v. 100.95 Acres of Land in Thurston County*, 719 F.2d 956, 961-62 (8th Cir. 1983), the Eighth Circuit confronted a similar question. There, the Winnebago Tribe of Nebraska held undivided future interests in land that a public utility company sought to condemn. *Id.* at 957-58. The court held that those future interests sufficed to make the relevant parcels tribal land, beyond § 357's condemnation reach. *Id.* at 961-62. For support, the court considered a regulation promulgated under the 1948 Right-of-Way Act (codified at 25 U.S.C. §§ 323-328).[4] *Id.* at 962. That regulation, and its amended version, treats any tribal interest as sufficient to establish tribal-land status. *See id.* ("'Tribal land' means land *or any interest therein*, title to which is held by the United States in trust for a tribe . . . ." (quoting 25 C.F.R. § 169.1(d) (1983))); 25 C.F.R. § 169.2 (2016) ("Tribal land means any tract in which the surface estate, or an undivided interest in the surface estate, is owned by one or more tribes in trust or restricted status."). The BIA has also clarified that "a tract is considered 'tribal land' if any interest, fractional or whole, is owned by the tribe. A tract in which both a tribe and individual Indians own fractional interest is considered tribal land for the purposes of regulations applicable to tribal land." Rights-of-Way on Indian Land, 80 Fed. Reg. 72,492, 72,497 (Nov. 19, 2015) (codified at 25 C.F.R. pt. 169). In doing so, the BIA

---

[4] A district court in our circuit, also looking to the regulations for clues, similarly found that because a tribe "owns an undivided 1.1% interest in the tract that is held in trust, the Court finds that the tract is tribal land and cannot be condemned pursuant to 25 U.S.C. § 357. The Court, therefore, finds that it does not have subject matter jurisdiction over this action." *Enable Okla. Intrastate Transmission, LLC v. A 25 Foot Wide Easement*, No. CIV-15-1250-M, 2016 WL 4402061, at *3 (W.D. Okla. Aug. 18, 2016).

rejected opposing views that would have limited tribal land to tracts not individually owned or in which the tribe holds a majority interest. *Id.* The BIA also noted that the different treatment afforded to individual and tribal interests befits the unique government-to-government relationship between the United States and Native tribes, and federal attempts to promote tribal self-governance. *Id.* at 72,492. Thus, even if tribal interest does not constitute a majority interest, tribal consent is still required for a right-of-way. *Id.* at 72,509.

These regulations have a limited impact on our interpretation of § 357 because they do not apply to condemnation actions. *Id.* at 72,495, 72,517. PNM views the inapplicability of the regulations as a critical point, arguing that the district court and the Eighth Circuit erred by considering them. PNM ignores that the district court went to great lengths to explain that the regulations were referenced "only to amplify" the court's conclusion about tribal lands based on § 357's plain meaning. Appellant App. vol. 2 at 311. We view the regulations similarly. Faced with a definition based on the federal government's long-stated policy goal of respecting tribal sovereignty, PNM gives us no alternative definition other than its extreme position that § 357 reaches even land held entirely by a tribe. In essence, we face two choices: (1) concluding that all land ever allotted is subject to condemnation under § 357, even if a tribe reobtains a majority or total interest in it, or (2) concluding that even previously allotted land that a tribe reobtains any interest in becomes tribal land beyond condemnation under § 357. Governed by § 357's plain language, we must choose the latter approach. We side with the Eighth Circuit and agree with the district court's conclusion: "When all or part of a

19

parcel of allotted land owned by one or more individuals is transferred to the United States in trust for a tribe; that land becomes 'tribal land' not subject to condemnation under § 357." *Id.* at 304.[5]

V

PNM argues that Congress would not have encouraged tribes to increase their tribal lands under land buy-back and consolidation programs if it had believed that it correspondingly was shrinking § 357 condemnation authority for those reacquired lands. And if that is so, PNM argues that this shows Congress never intended tribal lands to be exempt from condemnation under § 357. We reject these arguments. First, Congress has known about the Eighth Circuit's case for 34 years and has not amended § 357 to allow condemnation of tribal lands. Second, the Acts creating tribal buy-back and consolidation programs say nothing about allowing condemnation on tribes' reacquired land. So we must conclude that § 357, as in 1901, does not give condemnation authority over tribal lands.

PNM complains that our interpretation of § 357 will create "stranded" infrastructure on tribal land for which it will now have no choice but to negotiate rights-of-way with the tribes or face trespass actions. Appellant Reply Br. at 26. PNM goes so far as to raise, without elaboration, the specter of a due-process deprivation.

---

[5] Because we hold that the tribal interests make Allotments 1160 and 1392 tribal land for the purposes of § 357, PNM cannot proceed with a condemnation action against the individual interests in the parcels while leaving the tribal interests undisturbed. Holding otherwise would accomplish little other than to waste judicial resources, and those of PNM, as PNM would still need tribal consent before it could obtain a right-of-way under 25 U.S.C. § 324.

But PNM has no legal backing for its interpretation. No court has held that § 357 allows condemnation of tribal land, whether the tribal interest is fractional, future, or whole. The only major decision on point is *Nebraska Public Power District*, decided by the Eighth Circuit in 1983, holding that any tribal interest, including undivided future interests, acquired by the tribe after allotment defeats any condemnation authority provided in § 357. 719 F.2d at 961-62. In managing the transmission line in this case and its other infrastructure, PNM had every reason to know about the Eighth Circuit case, as well as the reigning canon of construction favoring tribal sovereignty. PNM invested in the face of adverse precedent and with no supportive case law at its back. Whatever negative policy effects it claims may follow, PNM's remedy lies elsewhere.

VI

Because the Navajo Nation did not acquire its undivided fractional interests by allotment, PNM argues that the Nation is a mere successor-in-interest under § 357. *See Transok*, 565 F.2d at 1153. All agree that the Navajo Nation acquired its interests in the disputed parcels by the congressionally approved mechanisms of conveyance and intestate descent. The issue is not how the tribe acquired the land, but instead what is the land's present status now that the tribe has acquired it. As discussed, we hold that the land is now tribal land and thus beyond the reach of condemnation.

PNM also attempts to make a distinction where none exists. PNM argues that it does not seek to divest the tribe of its fractional interest, but instead merely to condemn a right-of-way on its land. We acknowledge as much, but § 357 contains no authorization for any tribal-land condemnation, whether by divestiture or otherwise. Because we have

21

determined that Allotments 1160 and 1392 are tribal land, PNM cannot force condemnation.

In addition, PNM argues that § 357 supports PNM's condemnation authority by the manner in which it provides for condemnation payments. Section 357 provides that money awarded as damages from a condemnation action "shall be paid to the allottee." PNM seizes upon this language and, combined with the United States' off-handed observation that the payment language also applies to an allottee's heirs, uses it to argue that, if § 357 reaches heirs despite a lack of explicit textual reference, must not § 357 reach tribes also?  In this argument, PNM once again suggests that tribes (like heirs) are mere successors-in-interest. But unlike ordinary heirs inheriting interests in land, tribes are "sovereign political entities possessed of sovereign authority." *Nanomantube v. Kickapoo Tribe in Kan.*, 631 F.3d 1150, 1151-52 (10th Cir. 2011). That Congress allows tribes to inherit and purchase interests in previously allotted land does not mean that Congress subjects the reacquired tribal lands to condemnation under § 357. Absent explicit authorization, tribal sovereignty prevails.

PNM also argues that the significance of a tribal interest on an ever-allotted land parcel depends on the statutory meaning of the word "lands" itself. Because condemnation is an "in rem" action, PNM argues, § 357 does not, and we should not, consider who owns interest in the "lands" as a relevant factor in determining § 357's reach. Appellant Opening Br. at 25-28; Appellant Reply Br. at 9. But as the district court noted, a § 357 proceeding is not a pure in rem proceeding. Thus, under § 357, we look not only to what lands are at issue, but to their ownership. Here, because the tribe owns

22

an interest in the disputed parcels, § 357's "[l]ands allotted in severalty to Indians" prerequisite is inapplicable and so the law gives PNM no authority to condemn. And that deprives us of federal jurisdiction under 28 U.S.C. § 1331.

Finally, PNM argues that interpreting § 357 as we do will leave it vulnerable to trespass actions and paying higher compensation to obtain consent. Worse, it argues, because of congressional efforts to help tribes buy back interest in lands lost during the Allotment Era, the availability of condemnation under § 357 will continue to shrink as tribes avail themselves of well-funded programs enabling them to buy back formerly tribal land. This, PNM argues, amounts to an implied partial repeal of § 357, a position built upon its view that § 357 allows condemnation of tribal lands. Because we reject that view, the argument has no force.

Nor do we believe that PNM's unfavorable policy outcome necessarily comes from Congress overlooking it. In the 116 years after the 1901 Act, Congress has not amended § 357 to favor PNM's interpretation. Nor has it responded to *Nebraska Public Power District* in the thirty-four years since the Eighth Circuit decided that case disfavoring similar arguments to PNM's. Instead, Congress has acted to protect and strengthen tribal sovereignty. *See, e.g.*, Rights-of-Way on Indian Land, 80 Fed. Reg. at 72,509 (observing that requiring tribal consent for a right-of-way "restores a measure of tribal sovereignty over Indian lands and is consistent with principles of tribal self-governance that animate modern Federal Indian policy"); U.S. Dep't of Interior, Updated Implementation Plan, Land Buy-Back Program for Tribal Nations 10, 23, 31 (2013) (noting that a "foundational goal" of the buy-back program is "to strengthen tribal

23

sovereignty" and prioritizing acquisitions to accomplish that goal); *see also Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2043 (2014) (Sotomayor, J., concurring) (noting that a "key goal of the Federal Government is to render Tribes more self-sufficient"); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143-44 (1980) (recognizing that Congress has demonstrated "a firm federal policy of promoting tribal self-sufficiency" and "tribal independence").

PNM's claims that condemnation serves the interest of the tribe and its members by allowing continued operation of transmission lines on tribal land are likewise best directed elsewhere. Such claims may be valuable during negotiations for voluntary rights-of-way. If the tribe does not accept such claims as true, that is the tribe's prerogative.

## VII

We also deny the motion to intervene of Transwestern Pipeline Company, LLC (Transwestern). Transwestern first entered this case as a party after PNM named it as a defendant possibly having an interest in the property involved in the condemnation action. Transwestern has a right-of-way crossing parts of Allotment 1392, but not the part that PNM sought to condemn. So Transwestern disclaimed any interest in the easements that PNM sought and also waived any future notice of the proceedings. When the Navajo Nation filed a motion to dismiss, Transwestern chose not to file an opposing brief. At the district court, the Navajo Nation and the United States argued that the land in dispute was tribal land beyond § 357's condemnation authority. When the district court dismissed PNM's condemnation action for Allotments 1160 and

24

1392, Transwestern concurred with PNM's motion to alter or amend the Dismissal Order and its request for certification of issues for interlocutory appeal. In addition, Transwestern filed an "Answer and/or Cross-Petition" in support of PNM's Petition for Permission to Appeal. Transwestern Intervention Reply Br. at 5. When Transwestern filed a motion to participate as a party on appeal, we denied it, allowing Transwestern instead to move to intervene or appear as amicus.

We evaluate motions to intervene on appeal based on the four requirements of Fed. R. Civ. P. 24(a): (1) an applicant's timely application, (2) an "interest relating to the property or transaction which is the subject of the action," (3) possible impairment or impediment of that interest, and (4) lack of adequate representation of that interest by existing parties. *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1103 (10th Cir. 2005). Though we usually take a liberal view of Rule 24(a), when an applicant has not sought intervention in the district court, we permit it on appeal "only in an exceptional case for imperative reasons." *Id.* at 1103 (quoting *Hutchinson v. Pfeil*, 211 F.3d 515, 519 (10th Cir. 2000)). We do not interpret Rule 24(a) as imposing "rigid, technical requirements," but instead read it as capturing the practical circumstances that justify intervention. *San Juan Cty. v. United States*, 503 F.3d 1163, 1195 (10th Cir. 2007) (en banc). Under these standards, we conclude that we must deny Transwestern's motion to intervene.

First, PNM is adequately representing Transwestern's interest in the case. When the applicant and an existing party share an identical legal objective, we presume that the party's representation is adequate. *Tri-State Generation &*

25

*Transmission Ass'n, Inc. v. N.M. Pub. Regulation Comm'n*, 787 F.3d 1068, 1072-73 (10th Cir. 2015). Here, PNM and Transwestern have the same legal objective—prevailing on their interpretation that § 357 allows condemnation of land ever allotted to Indians in severalty, even when a tribe later reacquires an interest.

Second, Transwestern had ample opportunity to be heard at the district court and declined to do so. At the most consequential phase of the district court proceedings—the Navajo Nation's ultimately successful motion to dismiss—Transwestern declined to participate in briefing. Both the Navajo Nation and the United States raised the now-disputed issue of the scope of § 357 in the district court. Transwestern has already had the opportunity it now seeks and let it slip by.[6]

Transwestern argues that an adverse decision for PNM in this case would significantly affect its own extensive network of energy infrastructure. That seems likely. But that was equally true in the district court, where Transwestern declined to make its arguments. We see little that has changed in the meantime, except perhaps a heightened fear of an unfavorable decision.

Nor is Transwestern being excluded from the case. All parties consent to Transwestern's status as amicus curiae, and we have considered the company's

---

[6] We decline to decide whether the United States is correct in its allegation that Transwestern engaged in "sandbagging tactics" by willfully holding back arguments in the district court in hopes of more favorable treatment on appeal. United States Intervention Br. at 2. But opening the door to such tactics is another reason weighing against allowing Transwestern's intervention. *See Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1127 (10th Cir. 2011).

briefed arguments. But Transwestern's legal objective duplicates PNM's, and its arguments come too late for us to grant intervention.[7]

## CONCLUSION

For the reasons stated, we affirm the district court's dismissal of the condemnation action for lack of subject-matter jurisdiction as to the two land parcels in which the Navajo Nation holds an interest.

---

[7] Granting Transwestern's motion to intervene would not change the outcome of the case. The company offers only one relevant argument that was not substantially raised by the appellant: that the Supreme Court in *County of Yakima* allowed the local county to tax lands that had been earlier allotted from a tribal reservation, that had passed out of trust status into fee-simple status, and that later had been repurchased by the tribe. 502 U.S. at 270. Transwestern argues that this shows that the Supreme Court recognizes the permanence of a land's allotment status even after the tribe re-obtains the land. Thus, in our case, Transwestern argues, we should recognize the permanence of the disputed land's allotment status even after a tribal purchase and inheritance.

But *County of Yakima* differs from our case in at least one key aspect—here, the land never became fee-simple land. Instead, it has always retained its status as held in trust by the United States. What *County of Yakima* turned on was not allotment status, but fee-simple status. The Court held that once land had become fee-simple land, the tribe could not unilaterally return it to protected status and exempt itself from ad valorem taxes via its purchase. *Id.* The Court did not give any independent meaning to allotment status—it simply reviewed that history to show why the relevant Act of Congress resulted in the land being held in fee-simple status. *Id.* at 254-56, 258-60. Moreover, a case on local tax authority does not automatically compel us to adopt the same principles for condemnations.

PNM raised a similar argument in the district court based on *Oneida Tribe of Indians of Wisconsin v. Village of Hobart*, 542 F. Supp. 2d 908 (E.D. Wis. 2008), and the district court rejected it for the same fee-title status versus trust status divide that we have just discussed. PNM did not raise the case again on appeal.