**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 10, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MARCIA W. DAVILLA; BENJAMIN
BLACKSTAR; THOMAS
BLACKSTAR, III; VANNETTE M.
BRANHAM; EDMOND L. CARTER;
PATRICIA CARTER FILES;
HAROLD F. DUPOINT; CARRIE G.
DUPOINT; RUDOLPH W. FISHER,
JR.; CAMERON KEAHBONE;
SINDY M. KEAHBONE; GILBERT
C. KEAHBONE; MARK B.
KEAHBONE; MARI L. KEAHBONE;
PERRY K. KEAHBONE; BLAKE E.
KEAHBONE; PATRICK
KEAHBONE, JR.; EDBERT E.
KEAHBONE, JR.; RENA A.
KILLSFIRST; KATINA S. LIPTON;
JANICE C. MAMMEDATY;
AMANDA M. MCCARTHY;
MICHAEL R. MCCARTHY;
MAYREDENA M. PALMER;
RACHEL M. PALMER; MEGAN L.
PALMER; LAUREN SILVERBIRD;
ANGELA R. SILVERHORN;
HARVEY E. TUCKER; WILLIAM K.
WARE; SAMUEL M. WARE;
MATTHEW M. WARE; BETTY L.
WARE; COREY WARE; PATRICIA
WARE; JEAN WARE; WESLEY
WARE, III; MELVA J. WERMY,

     Plaintiffs - Appellees,

v.

No. 17-6088

ENABLE MIDSTREAM PARTNERS
L.P.; ENABLE G.P., LLC; ENABLE
OKLAHOMA INTRASTATE
TRANSMISSION LLC, formerly
known as Enogex, LLC,

Defendants - Appellants.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 5:15-CV-01262-M)**

Andrew W. Lester (Barry L. Pickens, Spencer Fane LLP, Overland Park, Kansas, with him on the briefs), Spencer Fane LLP, Oklahoma City, Oklahoma, for Appellants.

Dustin T. Greene (David C. Smith, Kilpatrick Townsend & Stockton LLP, Washington, D.C., and Thurston H. Webb, Kilpatrick Townsend & Stockton LLP, Atlanta, Georgia, with him on the brief), Kilpatrick Townsend & Stockton LLP, Winston-Salem, North Carolina, for Appellees.

Before **TYMKOVICH**, Chief Judge, **LUCERO** and **HARTZ**, Circuit Judges.

**TYMKOVICH**, Chief Judge.

Enable Intrastate Transmission, LLC owns and operates a natural gas pipeline that crosses Indian allotted land in Anadarko, Oklahoma. A twenty-year easement for the pipeline expired in 2000. Enable failed to renew the easement but also failed to remove the pipeline. In response, roughly three-dozen

individual Native American Allottees—who hold equitable title in the allotted land—filed this lawsuit.

The district court granted summary judgment to the Allottees, ruling on the basis of stipulated facts that Enable was liable for trespass. The court then enjoined the trespass, ordering Enable to remove the pipeline. Enable appeals both rulings, claiming several legal errors.[1]

We affirm in part, reverse in part, and remand for further proceedings. The district court properly granted summary judgment to the Allottees but erred in issuing the permanent injunction. The availability of equitable relief in this case depends on the relative weight of interests not yet considered below. We leave those considerations for the district court to determine in the first instance.

## I.  Background

"After the formation of the United States, the [Indian] tribes became 'domestic dependent nations,' subject to plenary control by Congress." *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1872 (2016) (quoting *United States v. Lara*, 541 U.S. 193, 204 (2004)); *see also Cty. of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 234 (1985) ("With the adoption of the Constitution, Indian

---

[1] The Allottees have also filed a motion for partial dismissal of this appeal, asserting that we lack jurisdiction over one of the interlocutory orders issued below. The merits briefing makes clear, however, that Enable does not appeal the order in question. We therefore DENY the motion as moot.

relations became the exclusive province of federal law."). This "plenary authority" includes "full power to legislate concerning . . . tribal property." *Winton v. Amos*, 255 U.S. 373, 391 (1921); *see also Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue*, 458 U.S. 832, 837 (1982) (linking Congress's "broad [regulatory] power . . . [over] tribal affairs" to "the Indian Commerce Clause" and "the semi-autonomous status of Indian tribes" (first citing U.S. Const. art. I, § 8, cl. 3; then citing *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980))). *See generally White Mountain*, 448 U.S. at 141–45 (explaining the relationship between federal, state, and tribal regulatory authority).

Congress exercised that power during the "Allotment Era" of the late-nineteenth and early-twentieth centuries by "carv[ing] [Indian] reservations into allotments and assign[ing] the land parcels to tribal members." *Pub. Serv. Co. v. Barboan*, 857 F.3d 1101, 1104 (10th Cir. 2017). *See generally id.* at 1104–06 (detailing the history of the Allotment Era). This project aimed to promote Indian assimilation by encouraging private property ownership and agricultural pursuits. *E.g.*, *Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649, 1652 (2018).

But all did not go according to plan. "[M]any of the early allottees quickly lost their land through transactions that were unwise or even procured by fraud." *Cty. of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 254 (1992). In response, Congress "restricted immediate alienation or

encumbrance" in favor of a trust-based model. *Id.* Through the Dawes Act, ch. 119, 24 Stat. 388 (1887), *repealed by* Indian Land Consolidation Act Amendments of 2000, Pub. L. No. 106-462, §§ 101–103, 114 Stat. 1991, 1991–2006 (codified at 25 U.S.C. §§ 2201–2219), Congress empowered the President to allot reservation land *in trust* rather than granting immediate, fee simple ownership, *County of Yakima*, 502 U.S. at 254. Under these trust arrangements, the United States retained legal title of allotted parcels while Indian allottees received equitable title. *See id.* An allottee could secure a fee simple land patent only upon dissolution of the trust, which the government would allow after a term of years or by special determination. *Id.* at 254–55.

It was through this program that, in August of 1901, President William McKinley allotted 160 acres of land in Anadarko, Oklahoma, to a Kiowa woman named Emaugobah. But Congress's allotment project "came to an abrupt end . . . with passage of the Indian Reorganization Act" in 1934. *Id.* at 255. Under that legislation, "Congress halted further allotments and extended indefinitely the existing periods of trust applicable to already allotted (but not yet fee-patented) Indian lands." *Id.* As a result, Emaugobah never received a fee simple patent. And well over a century later, the federal government still holds roughly 136 acres of Emaugobah's tract in trust for the benefit of her tribe and thirty-some individual Allottees.

Meanwhile, Congress's vacillation on Indian land policy left "a checkerboard of tribal, individual Indian, and individual non-Indian land interests" across Indian country. *Barboan*, 857 F.3d at 1105. This, in turn, created its own set of problems. As Congress hemmed and hawed over Indian affairs, the American people headed west and industrialized. The Great Plains—once passable only by foot, hoof, and wagon—slowly but surely sprouted a network of train tracks, telegraph wires, and other conduits of modern commerce. "[T]o help ensure that [such modern] necessities . . . could" span the continent "without encumbrance," Congress soon enacted a series of "right-of-way statutes." *Id.*

As relevant here, these laws empowered the Secretary of the Interior to approve easements "for all purposes . . . over and across any lands . . . held in trust by the United States for individual Indians or Indian tribes." 25 U.S.C. § 323. But the Secretary could not do so unilaterally. Instead, the Secretary needed "the consent of the proper tribal officials" or, where applicable, "individual Indian owners." *Id.* § 324. In the case of allotments shared among multiple Indians, the law required consent of a "majority of the [equitable] interests" to approve a right-of-way. *Id.*

In 1980, acting under these provisions, the Secretary allowed conveyance of a twenty-five-foot-wide pipeline easement over a strip of Emaugobah's allotment.

By its terms, the easement would allow Producer's Gas Company to "install . . .

and thereafter use, operate, inspect, repair, maintain, . . . and remove a single

buried [twenty-inch] natural gas pipeline" within a twenty-year period. App. 40.

Producer's Gas later conveyed both the easement and the pipeline to Enable.

When the easement expired in November 2000, however, Enable's pipeline

remained buried in the ground. Enable eventually sought a new twenty-year

easement by approaching the Allottees and applying for approval from the Bureau

of Indian Affairs. But the company failed to secure approval for the new

easement from a majority of the equitable interests. Accordingly, the Bureau

cancelled Enable's right-of-way application. Apparently undeterred, Enable

continued to operate the pipeline.

The Allottees eventually sued. Their complaint claimed Enable was

committing a trespass and sought a court order compelling the pipeline's removal.

The parties agreed on most of the relevant facts, so the Allottees moved for

partial summary judgment on liability for trespass and injunctive relief. The

district court granted the motion. Enable now appeals.

## II. Analysis

Enable raises two issues on appeal. First, it argues the district court erred

in granting summary judgment to the Allottees on their trespass claims. Second,

it contends the district court erred in issuing a permanent injunction to enforce the

summary judgment ruling. We affirm the district court's entry of summary judgment. We reverse its entry of a permanent injunction, however, and remand for the appropriate weighing of equities.

### A. Summary Judgment

We review district court grants of summary judgment de novo. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). In so doing, we ask the same question the district court asked: has discovery yielded a genuine dispute of "material fact" or is the movant "entitled to judgment" on a claim or issue without any need to weigh evidence? Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine dispute arises where the available evidence would allow a rational jury to accept either party's allegation of a particular fact. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013). But only facts that "could have an effect on the outcome" of a claim qualify as "material." *Id.* (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)). We construe all evidence and draw all inferences in favor of the party opposing a summary judgment motion. *See, e.g.*, *EagleMed LLC v. Cox*, 868 F.3d 893, 899 (10th Cir. 2017).

But it is *the law*, not the material facts, that complicates this case. When a dispute arises over possessory rights in Indian allotted land, federal law governs. *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1282 (10th Cir. 2010); *cf. Clearfield*

*Tr. Co. v. United States*, 318 U.S. 363, 366 (1943) ("The rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law.").  And although no act of Congress expressly creates a right of action for trespass on Indian allotted land, the parties agree such a right exists. *See*, Aplt. Br. at 16; Aple. Br. at 15.[2]  They do, however, dispute the rules of decision.  Thus we must determine those rules as a matter of so-called "federal common law."[3]

Because we lack a federal body of trespass law to protect the Allottees' federal property interests, we must borrow state law to the extent it comports with federal policy.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991);

---

[2] *Nahno-Lopez* also concerned an alleged trespass on Indian allotted land.  *See* 625 F.3d at 1282.  In that case, however, we affirmed summary judgment to the defendants due to a lack of evidence to prove an essential element.  *See id.* at 1283.  It is therefore unclear whether we have ever formally recognized a federal claim for trespass on an Indian allotment, or simply assumed such a claim's existence.  *Cf., e.g.*, *Gohier v. Enright*, 186 F.3d 1216, 1220–22 (10th Cir. 1999) (disposing of a claim under federal law without deciding whether to recognize that claim).

[3] Of course, "[t]here is no federal *general* common law." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (emphasis added).  Nevertheless, the federal courts have—confusingly—adopted the label "federal common law" to describe a certain variety of statutory interpretation. *See generally* Martha A. Field, *Sources of Law: The Scope of Federal Common Law*, 99 Harv. L. Rev. 881, 890–97 (1986) (explaining the meaning of the term).  Within this realm, federal courts drift far from codified text and interpret congressional silence to include rules of law protecting "uniquely federal interests." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (quoting *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981)).

*California ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 283

(1982); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979).  The State

of Oklahoma recognizes a right of action in trespass where one person "actual[ly]

physical[ly] inva[des] . . . the real estate of another without the permission of the

person lawfully entitled to possession."  *Williamson v. Fowler Toyota, Inc.*, 956

P.2d 858, 862 (Okla. 1998).  In other words, a trespass occurs when "one . . .

enters upon the property of another without any right, lawful authority, or express

or implied invitation, permission, or license."  *Id.*  The entry must not be "in the

performance of any duty to the owner or person in charge or on any business of

such person."  *Id.*  Instead, a trespasser comes or remains on land "merely for his

own purposes, pleasure, . . . convenience, or out of curiosity."  *Id.*

Our reading of Oklahoma law thus yields three elements constituting the

Allottees' federal trespass claims.  *First*, the Allottees must prove an entitlement

to possession of the allotment.  *Second*, they must prove Enable physically entered

or remained on the allotment.  *Finally*, they must prove Enable lacked a legal

right—express or implied—to enter or remain.  The stipulated facts already

described definitively prove the first two elements.  Enable takes issue, however,

with the entry of summary judgment on the third.

### 1. *Consent as a Defense to Trespass*

Enable contends it has produced evidence of consent sufficient to prove a legal right to maintain the pipeline despite the easement's expiration. *See* Aplt. Br. 20–23. Moreover, Enable argues the Allottees' failure to address this evidence in their opening summary judgment brief below should have rendered the motion insufficient at the outset. *See id.* at 23–25.

We first address the role of consent in this area of law. In *Nahno-Lopez* we considered a similar trespass action regarding Indian allotted land. *See* 625 F.3d 1279. Several individual Comanche had agreed to lease their allotted land to the Fort Sill Apache Tribe for development of a casino parking facility. A controversy then arose among the allottees, the Tribe, and the Bureau of Indian Affairs regarding the lease's validity. The allottees sued the Tribe, claiming trespass. The district court granted summary judgment to the Tribe.

We affirmed. We reasoned that the Comanche allottees had not offered record evidence sufficient to survive summary judgment. We specifically noted the Comanche allottees' failure to controvert the Tribe's evidence of "consent" to the alleged trespass—namely, the lease document and acceptance of rent payments. *See id.* at 1280, 1284. Because, in our words, "consent forms a complete defense to trespass" under the incorporated Oklahoma law, we upheld the summary judgment order. *Id.* at 1284.

Enable relies on this language in arguing it has a sufficient fact question regarding consent. In 2004, Enable obtained written consent forms from five of the thirty-seven individual Allottees in this case. The forms show these five Allottees' willingness to grant a new right-of-way for the pipeline in exchange for cash payments.[4] Despite the fact that these Allottees hold less than ten percent of the interests in equitable title, Enable contends their consent creates a triable factual dispute precluding summary judgment under *Nahno-Lopez*. *See* Aplt. Br. at 21–23. If consent is "a complete defense to trespass," Enable argues, then these forms would allow a reasonable jury to rule against trespass liability.

This argument confuses the law. Admittedly, our concise presentation of "consent" as a "complete defense to trespass" in *Nahno-Lopez* somewhat oversimplified the rule. To be sure, the rightful possessor of real property cannot hold his licensees liable for trespass under Oklahoma law. But this is because—as we have just explained—the defendant's *lack of a right to enter* is an *element of the claim*. Accordingly, evidence of a plaintiff's consent to a defendant's entry on the land will defeat liability in those cases where the plaintiff's consent itself creates a right to enter or remain. In such cases, the claim will fail for lack of proof on an essential element.

---

[4] The Allottees' have contested the continued validity of these fourteen-year-old forms. *See* Aple. Br. at 32–33. We assume their validity for the sake of argument.

When it comes to maintaining a pipeline over Indian allotted land, however, Congress has dictated the prerequisites of a right to enter by statute. Enable thus has no legal right to keep a structure on the Allottees' land unless and until it secures a right-of-way for that purpose from the Secretary of the Interior. *See* 25 U.S.C. § 323. The Secretary must, in turn, have the approval of the relevant Indian stakeholders. *See id.* § 324.

The statute notwithstanding, Enable argues "[a] *single owner* of a tenancy in common may enter into a lease for the entire co-tenancy property without any other's consent." Aplt. Br. at 22 (emphasis added). Enable gives us no reason to equate the Allottees' interest in the land with a traditional tenancy in common. But even if it were, the authorities Enable identifies do not support this bold assertion. *See United States v. Craft*, 535 U.S. 274, 280 (2002) (explaining, in dicta, that under traditional English common law, cotenants "may each unilaterally alienate [or encumber] *their shares*" but also have "the right to . . . exclude third parties from" the property (emphasis added)); *Anderson v. Dyco Petroleum Corp.*, 782 P.2d 1367, 1371–72 & n.8 (Okla. 1989) (holding that cotenants in the "working interest in [a] natural gas well" may each "market production from the well and . . . [sell] gas to a purchaser . . . without consent of other cotenants," *id.* at 1371). More to the point, those authorities fall well short of holding that one cotenant has no right of action for trespass under Oklahoma

law when another cotenant—much less a *small minority* of cotenancy interests—has agreed to a right-of-way easement. And though we have found no Oklahoma authority directly on point, other jurisdictions have adopted a directly opposite view. *See, e.g.*, *Burnham v. Balt. Gas & Elec. Co.*, 144 A.2d 80, 87 (Md. 1958) ("The authorities appear to be uniform in holding that a cotenant cannot by himself grant an easement that will bind his cotenants.").

Moreover, even if Oklahoma *would* say that this evidence could defeat any trespass claim, we would not incorporate such a rule into the Allottees' *federal* right of action. As we explained above, federal courts should only incorporate state rules of decision into federal claims to the extent those rules are consistent with federal law and policy. *See, e.g.*, *Kamen*, 500 U.S. at 98. Needless to say, securing the approval of a majority of beneficial interests plus the government presents a greater challenge than getting the consent of just a few minority stakeholders. Thus, if the consent of a minority of interests in equitable title could defeat any federal claim for trespass on an Indian allotment, there would be no point to fulfilling the more stringent requirements of securing a right-of-way under federal statute. Adopting Enable's view would therefore frustrate federal Indian land policy, effectively robbing Indian allottees and the government of meaningful control over alienation. We thus reject Enable's theory of consent.

-14-

In light of this conclusion, Enable's proffered evidence plainly does not warrant reversal of the district court's summary judgment ruling. The undisputed facts—expiration of the easement, specifically—show that Enable lacks a legal right to keep the pipeline in the ground. The consent forms would not allow a reasonable jury to find otherwise.

The Allottees' briefing below did not bar the district court from reaching this conclusion either. To be sure, the Allottees had to show liability was "appropriate as a matter of law" to support summary judgment. *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). And they did not mention the consent evidence in their initial motion. But the consent evidence would not have contributed to the initial showing of liability. Thus, because the Allottees raised the stipulated facts that the easement had expired and not been renewed, the onus fell to *Enable* to put its right to entry at issue. *See Anderson v. Dep't of Heath & Human Servs.*, 907 F.2d 936, 947 (10th Cir. 1990).

Nor did the district court exceed its discretion by allowing the Allottees to file a reply brief addressing consent after Enable raised the issue. *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998) (applying the abuse of discretion standard). Enable had a full opportunity to brief the issue—indeed, it *raised* the issue itself. More importantly, Enable gives no indication that it sought and was denied an opportunity to file a surreply. Thus, the court below

-15-

had every right to reach and resolve this issue. *See Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1268–69 (10th Cir. 2007).

## 2. *Demand for Removal*

Enable also argues that no duty to remove the pipeline ever arose— expiration of the easement notwithstanding—because the Allottees never demanded that Enable remove the pipeline.

We note first that Enable failed to raise this argument below. A litigant must preserve an issue for appellate review by pressing it in the trial court. *See, e.g., Carney v. Okla. Dep't of Pub. Safety*, 875 F.3d 1347, 1351 (10th Cir. 2017). And because Enable has not raised it under the plain error standard here, we have no obligation to address it. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130–31 (10th Cir. 2011).

Recognizing this problem, Enable has attempted to shift blame to the Allottees. According to Enable, the Allottees could only secure summary judgment if they briefed all elements of their trespass claim—including demand for removal. *See* Aplt. Br. at 18–20; Reply Br. at 2–4. But our adversarial system does not work that way. To be sure, a party seeking summary judgment must show the law and available evidence compel the requested outcome. *See* Fed. R. Civ. P. 56; *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Neal v. Lewis*, 414 F.3d 1244, 1248 (10th Cir. 2005); *Reed v. Bennett*, 312 F.3d 1190, 1194 (10th

Cir. 2002). And to do so, he must necessarily identify governing legal principles. But even an erroneous or incomplete view of the law can support summary judgment against a party that fails to contest it. Indeed, our courts act only as "neutral arbiter[s] of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243, 128 (2008). Thus, the movant's burden of production at the summary judgment stage does not abrogate the nonmovant's obligation to contest matters of law. If it did, district court review of summary judgment motions would become a waste of time in many instances. *See Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1244 n.6 (10th Cir. 2015).

But Enable's forfeiture does not prevent us from definitively rejecting its demand argument on the merits. *See, e.g.*, *United States v. Jarvis*, 499 F.3d 1196, 1201 (10th Cir. 2007); *see also Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1088 (10th Cir. 2006) (declaring our court's discretion to affirm on any sufficient ground the parties have had an opportunity to address). And in the interest of clarifying the law, we think it appropriate to do so. *Cf. Jarvis*, 499 F.3d at 1202.

Again, we incorporate Oklahoma law into this federal claim so long as it does not frustrate federal policy. *See, e.g.*, *Kamen*, 500 U.S. at 98. And we begin by noting the absence of any Oklahoma case establishing a demand requirement. *See Fairlawn Cemetery Ass'n v. First Presbyterian Church, U.S.A.*, 496 P.2d

1185, 1187 (Okla. 1972) (specifically considering a trespass by means of a permanent physical invasion of dirt fill); *Russell v. Williams*, 964 P.2d 231 (Okla. Civ. App. 1998) (considering trespass by a portion of a modular home); *see also Frank v. Mayberry*, 985 P.2d 773, 775–76 (Okla. 1999) (often cited as explaining Oklahoma's law of trespass); *Williamson*, 956 P.2d at 862 (same).

Moreover, even assuming—as Enable urges—that Oklahoma follows the Restatement (Second) of Torts, *see* Aplt. Br. at 17 & n.6; *but cf. Frank*, 985 P.2d at 776 (noting that the Oklahoma Supreme Court has "quoted [the Second Restatement] with approval," rather than *adopting* it), the argument still fails. The Restatement provides that "the continued presence on the land of a structure . . . which the actor . . . has placed" there "with the consent of" the lawful possessor constitutes a trespass "if the actor fails to remove it *after the consent has been effectively terminated*." Restatement (Second) of Torts § 160 (Am. Law Inst. 1977) (emphasis added). The comments clarify that "[i]f a structure . . . is placed on the land with the possessor's consent conditioned upon the actor's subsequently removing it, the termination of consent creates a duty to remove it." *Id.* cmt. d. And, unsurprisingly, "the lapse of any specified period of time by which the consent is restricted" terminates consent. *Id.* § 171(a).

According to these rules, the easement's expiration created a duty to remove the pipeline. Permission to lay and maintain the pipeline came

-18-

hand-in-hand with an obligation to remove it. *See* App. 40 (granting the easement to "install . . . and remove" the pipeline within a term of twenty years); *cf.* 25 C.F.R. § 161.5(I) (1980) (requiring right-of-way applicants to expressly agree to restore the land to its original condition). Indeed, there would have been no sense in limiting the easement term to twenty years otherwise. The Restatement would therefore not impose a separate obligation to demand removal on these facts.[5]

To be sure, had the Allottees *refused* to allow Enable to remove the pipeline, the Restatement might have forbidden liability for trespass. *See* Restatement (Second) of Torts §§ 160 cmt. m, 161 cmt. d. But Enable gives us no reason to believe the Allottees have ever prevented removal of the pipeline. Instead, Enable espouses the view that it would have incurred trespass liability for attempting to remove the pipeline unless and until the Allottees made a removal demand. This argument mischaracterizes the right-of-way grant and misstates Oklahoma law. Both allowed Enable to enter the land to remove the pipeline at least within the easement term, if not beyond it. *See* App. 40; *Williamson*, 956 P.2d at 862.

Ignoring these issues, Enable focuses on rules pertaining to structures "tortiously placed" on land and subsequently transferred to new owners. *See*

---

[5] For that matter, the complaint filed in district court acted as a demand for removal.

-19-

Aplt. Br. at 18 (discussing Restatement (Second) of Torts § 161). Of course, Producer's Gas—Enable's predecessor—did not tortiously place the pipeline on the land; it constructed the pipeline *with permission*. And the fact that Enable kept the pipeline on the land *without permission* does not render the initial placement tortious. Moreover, the only *transfer* of the pipeline occurred during the easement term, at which point the parties agree the pipeline's presence was still lawful. Finally, even assuming this case *had* involved a transfer after expiration of the easement, the Restatement makes clear that *notice* of a duty to remove—for instance, through the terms of an easement contract—binds the transferee. *See* Restatement (Second) of Torts § 161(2).

Finally, Enable errs by relying on the Ninth Circuit's decision in *United States v. Milner*, 583 F.3d 1174 (9th Cir. 2009), to bolster its position. In *Milner*, the Ninth Circuit considered an alleged federal trespass by anti-erosion structures originally placed on privately owned tidal uplands in Washington State. The boundary between the uplands and adjacent Indian tidelands had shifted with the gradual change of the mean high water mark over the course of several years. Eventually, the boundary line shifted so far that the stationary anti-erosion structures began encroaching on the tribal tideland. In defense against a trespass claim, the upland owners argued they lacked the *intent* necessary to commit a trespass. The Ninth Circuit rejected this argument, reasoning that intent followed

refusal to remove the structures despite notice of a duty to remove. That notice, said the court, followed the United States' demand for removal as legal title holder. *See id.* at 1190–91.

Even if we assumed the legal principles the Ninth Circuit applied in *Milner* had bearing on this case,[6] they would not support Enable's argument for a demand element. As we have explained, Enable acquired the pipeline *already knowing* the right-of-way would eventually expire. It therefore cannot—and indeed does not—claim it lacked notice of its duty to remove or intent to maintain the trespass.

We thus reject Enable's contention that the Allottees had to demand removal of the pipeline for trespass liability to arise.

\* \* \*

---

[6] The *Milner* court applied the Restatement (Second) of Torts under the somewhat ambiguous reasoning that both federal precedent and borrowed precedent from the State of Washington supported that application. *See United States v. Milner*, 583 F.3d 1174, 1182–83 & n.6 (9th Cir. 2009). The Restatement classifies trespass traditionally as an intentional tort, *see* Restatement (Second) of Torts § 158, with "intent" meaning a "desire[] to cause consequences of" the act in question "or . . . belie[f] that the consequences are substantially certain to result," *id.* § 8A. It is worth noting, however, that the Oklahoma courts have yet to develop a jurisprudence of intent with regard to real property trespass. Nevertheless, because Enable has never made an issue of it, the place of intent in Oklahoma tort law and, consequently, federal trespass law, does not bear on our analysis.

In sum, Enable's arguments against summary judgment fail under the incorporated trespass law of Oklahoma. And Enable has not argued for any conflict between that law, as we understand it, and federal policy regarding Indian allotted land. We therefore affirm the district court's grant of summary judgment.

### B. Permanent Injunction

The Allottees' success on the merits notwithstanding, Enable argues the district court applied the wrong legal standard in determining whether to issue a permanent injunction. According to Enable, the district court incorporated a simplified injunction rule from Oklahoma law when it should have adhered to basic tenants of federal equity jurisprudence. Aplt. Br. at 25–28.[7]

We agree. By failing to apply the federal courts' traditional equity jurisprudence to its remedy analysis, the court below committed an error of law and thus abused its equitable discretion. Accordingly, we must reverse the injunction order and remand for a full weighing of the equities.

Federal district courts have the power to order injunctive relief when equity so requires. *See Signature Props. Int'l Ltd. P'ship v. City of Edmond*, 310 F.3d 1258, 1268 (10th Cir. 2002). We review a district court's exercise of that power

---

[7] The Allottees contend Enable forfeited this argument by failing to raise it below. *See* Aple. Br. at 34–35. Our review of the briefing below, however, reveals that Enable *did not* acquiesce to the Allottees' proposed automatic-injunction rule and instead argued for the typical four-factor analysis.

for abuse of discretion only.  *See, e.g., id.*  As always, however, a district court abuses its discretion when it "bases its decision on an erroneous conclusion of law."  *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011) (quoting *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1224 (10th Cir. 2008)).

In this case, the district court relied primarily on Oklahoma law—with supplemental authority from other federal courts—to conclude that "equity will restrain [a continuing] trespass."  App. 268 (quoting *Fairlawn Cemetery*, 496 P.2d at 1187).[8]  As a result, it did not apply the usual four-factor test guiding federal courts' grant of permanent injunctive relief.  *See, e.g., eBay Inc. v. MercExchange, L. L. C.*, 547 U.S. 388, 391 (2006); *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014).  Though it observed "some courts have declined to enter an injunction when the trespass was unintentional and when the landowner" delays objection, it did not think such issues at play in this case.  App. 269.  Thus,

---

[8]  Where a refusal to remove a permanent structure effects the invasion of real property, it constitutes a "continuing trespass" under Oklahoma law.  *Fairlawn Cemetery*, 496 P.2d at 1187.  "Continuing trespass" is not a distinct legal wrong.  Rather, the ongoing, unabating nature of certain trespasses *continuously* gives rise to causes of action that the victim can sue on, and eventually can support equitable relief.  *See Hughes v. Harden*, 151 P.2d 425, 427 (Okla. 1944); *see also Bradley v. Renfrow*, 84 P.2d 430, 431 (Okla. 1938) (describing an allegation of continuing trespass as supporting pursuit of equitable relief).

with no further weighing of the equities, the court ordered Enable to remove the pipeline.

Generally, federal courts adopt state law even when the dispute is "governed exclusively by federal [common] law." *See United States v. Turley*, 878 F.3d 953, 957 (10th Cir. 2017). "Indeed, there is a 'presumption that state law should be incorporated into federal common law.'" *Id.* (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991)). This is partly because courts are hesitant, and for good reason, to create federal common law rules that are "wholly the product of a federal court's own devising." *See Kamen*, 500 U.S. at 98; *United States v. Yazell*, 382 U.S. 341, 353 (1966) (declining to "invent" a federal common law rule and "impose it upon the States"). Such policy, even when applied to cases arising under federal common law rather than diversity jurisdiction, supports "the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer*, 380 U.S. 460, 468 (1965).

But federal courts do not mechanically apply state law in every circumstance. "Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy 'dependent upon a variety of considerations.'" *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979) (citation omitted). And to guide this judicial policymaking, the Supreme Court has indicated that

-24-

federal courts should consider (1) "whether application of state law would frustrate specific" federal interests, (2) whether there is a "need for a nationally uniform body of law," and (3) other considerations such as whether "application of a federal rule would disrupt commercial relationships predicated on state law." *Id.* at 728–29; *see also Kamen*, 500 U.S. at 98. The considerations in this case lead us to conclude that the district court erred in applying Oklahoma rather than federal remedial law.

The district court erred because the circumstances presented here reveal "a distinct need for nationwide legal standards." *Kamen*, 500 U.S. at 98. As already explained, Congress provided a way for the Secretary of the Interior to approve easements "over and across any lands . . . held in trust by the United States for individual Indians or Indian tribes." 25 U.S.C. § 323. This right-of-way statute was "to help ensure that necessities such as telegraph lines and roads could continue without encumbrance." *Pub. Serv. Co. of New Mexico v. Barboan*, 857 F.3d 1101, 1105 (10th Cir. 2017). While this does not rise to the level of creating a federal interest that federal common law should manage, the nationwide application of this right-of-way statute suggests a need for a uniform federal standard.

This uniform standard is necessary because the Secretary has undoubtedly approved easements over and across Indian land in multiple states. And since

many of these easements are likely for a limited duration, these easements—for pipelines, telecommunication lines, and roads—like the easement at issue here, may fail to receive consent to renew by a "majority of the [equitable] interests" and may therefore be subject to an order of removal. *See id.* § 324. This prospect shows the distinct need for easement holders to be subject to the same standard for when an equitable remedy is required and when a legal remedy is sufficient—regardless of where the easement is located. Otherwise, an easement holder in Oklahoma and one in Kansas could be subject to differing permanent injunction standards despite both receiving an easement from the Secretary of the Interior pursuant to the same federal program.

We therefore conclude that the district court erred in failing to apply the federal permanent-injunction standard even though it properly applied Oklahoma trespass law. This is because our jurisprudence distinguishes between matters of right and matters of remedy. The Supreme Court has concluded that "State law cannot define the remedies which a federal court must give" and that "a federal court may afford an equitable remedy for a substantive right recognized by a State even though a state court cannot give it." *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 105 (1945). Thus, the practice of borrowing state rules of decision does not apply with equal force to determining appropriate remedies, especially equitable remedies, as it does to defining actionable rights.

Moreover, applying the federal permanent-injunction standard differs significantly from applying the federal common law of trespass. As explained, federal courts lack a body of federal trespass law to protect the Allottees' federal property interests. So applying federal trespass law would require our court to construct rules entirely of this court's creation. We accordingly borrow a body of well-developed state law to the extent it does not conflict with federal policy. These same considerations are not present when seeking to apply federal equitable remedies, however. Applying federal remedial law does not require this court to create federal common law or even to "fill the interstices of federal remedial schemes" with the court's own rules. *See Kamen*, 500 U.S. at 98 (declining to fashion federal rules to fill gaps in federal statutory remedial scheme); *Kimbell Foods*, 440 U.S. at 728 (same).

This is because the federal judiciary already has a well-developed body of law regarding equitable remedies to guide judicial discretion. The Supreme Court has repeatedly weighed in on the standard federal courts apply when granting or denying a permanent injunction. *See, e.g.*, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S 388, 391 (2006); *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 541–42 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, (1982). In each case the Supreme Court set out the proper standard for granting a permanent injunction and chastised the circuit court for granting equitable relief based solely

on success on the merits. *See Weinberger*, 456 U.S. at 311–312 ("It goes without saying that an injunction is an equitable remedy [that] . . . 'is not a remedy which issues as of course.'") (citation omitted). We may therefore apply a well-developed federal common law standard for issuing a permanent injunction that will fulfill the "distinct need for nationwide legal standards" called for in this case. *Kamen*, 500 U.S. at 98.

Thus, a federal district court's decision to permanently enjoin a continuing trespass on allotted land should take into account (1) whether an injunction is necessary to prevent "irreparable harm," (2) whether "the threatened injury outweighs the harm that the injunction may cause" to the enjoined party, and (3) whether the injunction would "adversely affect the public interest." *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014) (quoting *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009)).[9] Accordingly, by ordering Enable to remove the pipeline on the basis of liability alone, the district court legally erred and thus abused its discretion.

The Allottees' attempts to escape this conclusion do not persuade us. First, they argue the district court did not, in fact, apply a simplified rule. Instead, they

---

[9] We acknowledge that our circuit's articulation of the rule differs slightly from that of the Supreme Court in *eBay*. *Compare Kitchen*, 755 F.3d at 1208, *with eBay*, 547 U.S. at 393. But the subtle differences are not at issue, and we think the two articulations capture the same considerations in any event.

claim the court merely applied the usual rule to simplified facts. *See* Aple. Br. 35–38. But we see little support for this reading. The court below made no mention of the appropriate equitable considerations. Indeed, it went to great lengths to justify its analysis as legally, rather than just factually, appropriate.

Second, the Allottees invite us to affirm the district court *even if* it applied incorrect law, claiming the record clearly warrants relief regardless. *See* Aple. Br. at 38–41. But though—as we have already noted—we may generally affirm a district court order on any sufficient grounds the parties have had an opportunity to brief, *see Champagne Metals*, 458 F.3d at 1088, we resist that invitation. The discretion to issue a permanent injunction in this case rests with the district court, not us. *Cf., e.g.*, *Bailey v. State Farm Fire & Cas. Co.*, 414 F.3d 1187, 1191 (10th Cir. 2005). And just because we think the district court *could have* issued a permanent injunction under the proper test does not mean we can ignore an error of law and resolve the issue on appeal. "Injunctive relief is, by its very nature, fact-sensitive and case-specific." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 13 (1st Cir. 2002). Thus our court should generally refrain from "uphold[ing] a preliminary injunction on a ground that was not fully addressed" below. *Id.*

Moreover, if we did endeavor to balance the equities ourselves, we would not get very far. As the above makes clear, the sheer right to exclude simply

-29-

cannot begin and end the equitable analysis. *Cf. eBay*, 547 U.S. at 392–93. And the Allottees do not explain how the pipeline's presence works "irreparable harm" otherwise. *Kitchen*, 755 F.3d at 1208 (quoting *Sappington*, 582 F.3d at 1191). More importantly, without further evidence—which the Allottees have never proffered—we have no way of knowing the relative costs and benefits of Enable removing the pipeline, either as they pertain to these parties or the public at large. To the extent the Allottees have addressed these concerns, their arguments have offered legal analysis in lieu of pertinent facts. *See* App. 120–23; Aple. Br. at 38–41. In short, we will not assume the equities support injunctive relief in this case, or whether the district court would in fact award such relief under governing law.

In sum, we must remand the decision to the district court to weigh the equities in the first instance.[10]

## III.  Conclusion

For the reasons stated above, we **AFFIRM** the district court's grant of summary judgment to the Allottees, **REVERSE** the entry of the permanent injunction, and **REMAND** for further proceedings.

---

[10]  As a result, we do not reach Enable's challenge to the district court's compliance with Rule 52 of the Federal Rules of Civil Procedure. *See* Aplt. Br. at 28–30.

17-6088, *Davilla v. Enable Midstream Partners*

**HARTZ**, Circuit Judge, concurrence and partial dissent:

Except in one respect, I am pleased to join Chief Judge Tymkovich's opinion. Where I differ from the panel opinion is that I would apply the state law of Oklahoma, rather than federal law, to determine the remedy for Enable's trespass. Because the panel opinion covers the ground so well, my discussion can be relatively brief.

The dispute in this case concerns about 1300 feet of natural-gas pipeline that is part of a 100-mile pipeline between Canute and Cox City, Oklahoma, which in turn is part of a broader 2200-mile pipeline system within Oklahoma. Plaintiffs' claim is that this quarter-mile pipeline segment trespasses property held in trust for them by the United States. Because of the interest of the federal government, federal law governs. But there is no applicable federal trespass statute, so we decide this case as a matter of federal common law. As a general rule, federal common law regarding interests in real property adopts the law of the state where the property is located. *See United States v. Turley*, 878 F.3d 953, 956–57 (10th Cir. 2017). Transactions can be handled more expeditiously and with greater confidence when the government's counterparty knows it can rely on the local law with which it (or its attorney) is familiar.

The dispute before us, however, does require some consideration of federal statutory law. Easements for rights-of-way over what can be described, roughly speaking, as Indian lands must comply with 25 U.S.C. §§ 323–28, which set forth how consent to a right-of-way must be obtained, ordinarily through approval of the majority ownership interest of the known property owners (or tribal officials, if the land is tribal

land), *see id.* at § 324.  The easement for the pipeline in this case explicitly cites to those statutory provisions.  Much of the panel opinion, with which I fully agree, explains why we believe that such consent had lapsed for the pertinent portion of Enable's easement.

But consent is only one element of a trespass claim.  For the other elements, Oklahoma law governs.  That choice of law makes particularly good sense here.  The record does not show how much of the 100-mile pipeline or the 2200-mile pipeline system crosses land held in trust by the United States and how much of it crosses land that is privately owned.  But all of it is within Oklahoma, and surely it facilitates commerce to have a single legal regime govern what happens when a pipeline crosses land without the owner's consent.  Thus, this panel unanimously agrees that Oklahoma law governs the requirements of notice and demand to the trespasser.

Where I depart from the majority is regarding the law governing whether a permanent injunction should issue.  In my view, we should continue to apply Oklahoma law on that issue.  As one leading treatise has stated, "Rights and remedies are closely interrelated concepts; to deviate from the state's definition of the latter often also would change the former."  Wright & Miller § 4513 at 567.  That statement appears in a discussion of the *Erie* doctrine, explaining why in diversity cases federal courts should ordinarily look to state law in determining what remedy is appropriate, even when considering equitable remedies.  But the point applies here as well.  Once the federal court has decided that federal common law should incorporate state law regarding a cause of action, the same considerations should ordinarily counsel in favor of incorporating state law regarding the remedies available for that cause of action.

The majority believes that there are good reasons not to follow that approach here. The panel opinion states that there is "'a distinct need for nationwide legal standards'" with respect to the remedy in this case. Maj. Op. at 25 (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991)). It points out that the federal statute at issue here permits rights-of-way on Indian land "to help ensure that necessities such as telegraph lines and roads could continue without encumbrance." *Pub. Serv. Co. of New Mexico v. Barboan*, 857 F.3d 1101, 1105 (10th Cir. 2017). It reasons that because the statute applies in multiple states, fulfilling this purpose requires a uniform federal standard.

I am not persuaded. There is certainly a federal interest in uniform national application of the federal statutes that govern whether there has been valid consent to an easement over Indian land. But once, as here, it has been determined that there has not been compliance with the statute, that interest in uniformity has been served. We begin with a "'presumption that state law should be incorporated into federal common law.'" *United States v. Turley*, 878 F.3d 953, 956 (10th Cir. 2017) (quoting *Kamen*, 500 U.S. at 98)). That presumption has not been rebutted here.

I see no reason why local law should not determine what consequences flow when the former beneficiary of an easement loses its rights to the easement. The district court construed Oklahoma law as giving the victim of a continuing trespass an automatic right to obtain an order requiring the trespasser to remove the offending property. In the circumstances here, that means that Enable must remove its pipeline. What that amounts to in practice—since removal of the pipeline apparently would not benefit the landowners—is that the landowners have increased bargaining power in determining what Enable

3

must pay to continue the easement. This is an inherent and important component of the substantive rights provided to Oklahoma property owners. The purposes behind the federal statutes at issue here relate only to providing a reasonable mechanism for obtaining consent to an easement from Indian landowners. They say nothing about how much bargaining power landowners should have in negotiating with those seeking easements. In colloquial terms, the federal government has no dog in that fight. This is not a case, for example, where the easement was granted under a federal condemnation statute. In that circumstance the federal interest in having a pipeline cross the property might weigh against requiring the former easement holder to remove the pipeline from the burdened land. But in the present circumstance there is no such federal interest. Why should remedial rights of Indian landowners be different from those of other landowners who granted easements to Enable for the same pipeline? In particular, why should the Indian landowners have less bargaining power to negotiate a new easement price than do the other landowners, who can rely on Oklahoma state law when Enable trespasses on their land?

I acknowledge that there is problematic language in *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99 (1945), a diversity case. But as discussed at length in a leading treatise, the Supreme Court's language is obscure, and it is far from clear that federal courts have independent authority (aside from constitutional provisions and federal rules of procedure) to reject state equitable principles in diversity cases. *See* Wright & Miller § 4513; *id.* at 567 ("as a general rule, when forum state law defines the underlying substantive right, state law also governs the availability of such equitable remedies as a

4

permanent injunction"). I would refrain from incorporating the difficulty of *Guaranty Trust* into federal-common-law doctrine when that doctrine appears to provide the means to resolve the issue before us.

Also, I respectfully disagree with the panel opinion's view that this case is governed by Supreme Court authority governing the availability of permanent injunctions as a remedy for federal statutory claims, as in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (infringement suit under the Patent Act); *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 541–42 (1987) (preliminary injunction for violation of Alaska National Interest Lands Conservation Act); and *Weinberger v. Romero-Barcello*, 456 U.S. 305 (1982) (violation of Federal Water Pollution Control Act). In that context, one can presume that when Congress enacts a statutory cause of action it recognizes that traditional equitable relief is available. *See Weinberger*, 456 U.S. at 313. Here, however, there is no federal statutory cause of action.

I hesitate to dissent from what I consider to be a fine opinion. But we are plowing new ground here, and I think it useful to express some of the considerations that may counsel a different approach.